[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUG 21, 2008
THOMAS K. KAHN
CLERK

_____

No. 04-15645

_____

D. C. Docket No. 02-61534-CV-FAM

A.P.,
by and through his next friend, David Bazerman,
R.K.,
by and through next friend, David Bazerman,
N.M.,
by and through next friend, David Bazerman,
R.M.,
by and through next friend, David Bazerman,

Plaintiffs-Appellants,

versus

EDWARD FEAVER, individually,
JOHNNY BROWN, individually,
JENNIFER CHANG, individually,
SUSAN KANASKIE, individually,
SHARON WOODROOF, individually,
SUSAN WORSLEY, individually,
KATHERINE KAUFMAN, individually,
CORRINE MILLIKAN, individually,
et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

**(August 21, 2008)**

Before TJOFLAT and BARKETT, Circuit Judges, and MILLS,[*] District Judge.

PER CURIAM:

A.P., R.K., N.M., and R.M. appeal from an order of the district court dismissing their lawsuit against thirteen state officials[1] employed by the Florida Department of Children and Family Services pursuant to Federal Rule of Civil Procedure 12(b)(6). The plaintiffs brought suit against the state officials under 42 U.S.C. § 1983, alleging violations of their Fourteenth Amendment right to be safe

---

[*] Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

[1] The defendant-officials are as follows: Edward Feaver, Secretary of the Department of Children and Family Services; Johnny Brown, District 10 Administrator; Katherine Kaufman, a Program Operations Administrator of Protective Investigations and later Acting Child Welfare Director; Corinne Millikan, Family Services Specialist and Operations Management Consultant; Sharon Woodroof, Family Services Specialist and later Program Operations Administrator for Re-licensing and Foster Care; Susan Kanaskie, Protective Investigations Supervisor; Susan Worsley, Protective Investigator and later Foster Care Supervisor; Jennifer Chang, Program Operations Administrator for Licensing and Placement and later Family Services Specialist; Margaret Andrews, Licensing Counselor and later Licensing Supervisor; and Loubert Desmangles, Sharon Pollack, and Susan Wilburn, Family Services Counselors.

The complaint also named Winsome Smith, a Family Services Counselor, as a defendant. Because the only claim against Smith was brought by R.K., who has since settled, plaintiffs' appeal with respect to Smith is moot.

2

from an unreasonable risk of physical harm while in state custody. After careful review of the allegations against each defendant, we affirm in part, and reverse in part.

As to defendants Feaver, Brown, Kanaskie, and Pollack, we find no error, and affirm the dismissal of A.P., N.M. and R.M.'s claims against them.

As to defendants Chang, Woodroof, Millikan, Worsley, Andrews, Kaufman, Desmangles, and Wilburn, we find that the district court erred in dismissing A.P., N.M. and R.M.'s claims against them and reverse the dismissal of these claims in the Second Amended Complaint.

Accordingly, the judgment of the district court is **AFFIRMED in part; REVERSED in part; and REMANDED for proceedings consistent with this opinion.**

TJOFLAT, Circuit Judge, concurring, in part, and dissenting, in part:

Judges Barkett and Mills and I sharply disagree as to whether the factual allegations of plaintiffs' complaint are sufficient to state constitutional violations against the defendants in their provision of foster care and as to whether they are entitled to qualified immunity.[1] For the reasons advanced in this opinion, I concur in the part of the court's judgment affirming the district court's dismissal of the claims against Feaver, Brown, Kanaskie, and Pollack, and I dissent from the part of the court's judgment reversing the district court's dismissal of the remaining defendants. I write separately to provide the factual context in which plaintiffs' claims are presented and the legal rationale for my view that plaintiffs' factual allegations failed to establish that defendants possessed the requisite subjective

---

[1] I also disagree with Judges Barkett and Mills as to whether the court's per curiam opinion and my separate opinion should be published. This court's Local Rules and Internal Operating Procedures express the court's policy regarding the publication of opinions. 11th Circuit Rule 36-2 states that "[a]n opinion shall be unpublished unless a majority of the panel decides to publish it." The court's Internal Operating Procedures (I.O.P.) are to the same effect. The I.O.P. appended to Rule 36-2, states: "A majority of the panel determine whether an opinion should be published." The I.O.P further states that "[o]pinions that the panel believes to have no precedential value are not published." My colleagues are of the view that the opinions in this case have no precedential value; as unpublished, they should not be "considered binding precedent." 11th Cir. R. 36-2. My view is that these opinions have precedential value because of the questions the case presents. Suits against foster care workers are commonplace. Those administering foster care – whether, as here, the case workers who visit the children, their supervisors, or those occupying high-level administrative positions – need to know, they are entitled to know, where they stand, whether they are subject to suit simply for doing their job. Unpublished decisions, although "persuasive authority," id., do not give these workers much comfort. In parts IV. A. and B.1 supra, I cite five unpublished decisions, which, had they been published, would have dictated the outcome of this case.

4

knowledge of a substantial risk of serious harm to plaintiffs that the Constitution requires as a basis for personal liability under 42 U.S.C. § 1983. I would therefore affirm the district court's judgment as to all defendants.

I.

This appeal concerns the second phase of a controversy over the quality of foster care provided by the State of Florida's Department of Children and Family Services (the "Department" or "DCF") to dependent children in District 10, Broward County, in the late 1990s.[2] The first phase involved a class action suit for injunctive relief brought on behalf of the foster children in District 10; the district court granted prospective relief in the form of a consent decree. In the second phase, four members of the plaintiff class who had allegedly suffered child-on-child sexual abuse while living in a foster home sought damages from thirteen Department officials in their individual capacities for violations of the Fourteenth

---

[2] In Florida, the Department of Children and Family Services is responsible for children who have become dependents of the State. The Department may take into custody a child who has no legal custodian or any child it has probable cause to believe has been "abused, neglected, or abandoned, or is suffering from or is in imminent danger of illness or injury as a result of abuse, neglect, or abandonment." Fla. Stat. § 39.401(1)(b) (1997). Once a child has been taken into custody, DCF may seek to have the child declared a dependent. Fla. Stat. § 39.402 (setting forth standards for placement of children in shelter care); Fla. Stat. § 39.501 (describing the requirements of a petition for dependency). The dependency decision, however, ultimately lies with the state circuit courts. Fla. Stat. § 39.013(2) (granting jurisdiction over juvenile matters to the circuit court); Fla. Stat. § 39.507 (setting forth the requirements for an adjudicatory hearing on dependency). Once declared a dependent, the child may be placed in foster care. See Fla. Admin. Code Ann. r. 65C-13.014(1) (1997) (setting forth the requirements for foster care placement).

Amendment. The district court denied relief, dismissing the claims under Federal Rule of Civil Procedure 12(b)(6). This appeal challenges this ruling.

A.

On October 20, 1998, a class action suit for injunctive relief was filed under 42 U.S.C. § 1983[3] in the United States District Court for the Southern District of Florida on behalf of the over 1,000 dependent children in District 10 against the Secretary of the Department and the Administrator of District 10 in their official capacities.[4] The suit alleged that the Department and District 10 were denying the dependent children their constitutional right to safety and freedom from harm[5] by failing to provide proper care that was consistent with both professional judgment

---

[3] 42 U.S.C. § 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983.

[4] At the time suit commenced, Edward Feaver and Johnny Brown served as Secretary of the Department and as District 10 Administrator, respectively. Kathleen Kearney and Robert Cohen assumed their positions in 2000 and shortly thereafter were substituted as the defendants in the case.

[5] According to the complaint, this substantive constitutional right was guaranteed the dependent children by the Due Process Clause of the Fourteenth Amendment.

and Florida's foster care statutory and regulatory regime[6] – a failure so profound that it caused the children "to suffer harm which is often more severe than that which caused them to be removed from the custody of their parents" in the first place. The suit exposed the Florida foster care system as having reached a state of systemic crisis, and nowhere was this more evident than in District 10. A yearly staff turnover rate of 80% and a dearth of adequate placements spawned a rapidly increasing number of severely overcrowded homes with little supervision by the Department.[7] Burdened by caseloads that were between two and eight times the

---

[6] According to the complaint, in placing dependent children in foster homes, the Department and District 10 failed to heed the requirements of the following statutory and regulatory provisions: Fla. Stat. § 39.001(1)(I) (1998) (children should be placed in licensed foster home with "custody, care, and discipline as nearly as possible equivalent to that which should have been given by the parents" and which is drug and alcohol free), Fla. Stat. § 39.001(1)(m) (disruptions to a child's education should be minimized), Fla. Stat. § 39.001(3)(c) (children should be placed in "[a] safe and nurturing environment which will preserve a sense of personal dignity and integrity"), Fla. Admin. Code Ann. r. 65C-13.010(5)(g) (1995) (child counselor will visit a child placed in foster care at least once per month), Fla. Admin. Code Ann. r. 65C-13.010(1)(b)(6) (foster parents obligated to see that children receive adequate medical service), Fla. Admin. Code Ann. r. 65C-13.010(1)(b)(9) (foster parents obligated to see that children receive adequate educational services), Fla. Admin. Code Ann. r. 65C-13.010(5)(b)–(f) (information sharing obligations between foster parents and counselors). Perhaps most pointedly, the complaint alleged that the Secretary and the District Administrator failed to develop and implement adequate procedures for the prevention of abuse, Fla. Admin. Code Ann. r. 65C-13.015(1), and continually placed children in homes that failed to meet basic regulatory licensing requirements. Fla. Admin. Code Ann. r. 65C-13.011(2) (no more than five total children in a home without good cause); Fla. Admin. Code Ann. r. 65C-13.011(4) (foster parents must "have sufficient income to assure their stability and the security of their own family without relying on board payments"); Fla. Admin. Code Ann. r. 65C-13.011(9) (foster parents must meet regulatory screening requirements); Fla. Admin. Code Ann. r. 65C-13.011(11) (foster home must be comparable to other homes in the neighborhood, be free from unreasonably dangerous objects or materials, and be inspected by a local health inspector).

[7] The complaint alleged that over 400 children in District 10 were placed in overcrowded foster and shelter homes – more than twice that of the previous year. Additionally, 80 children in

7

recommended national standards, counselors were regularly unable to meet their monthly visitation requirements; in fact, a sampling of foster children in District 10 during this time revealed that nearly a quarter of the children surveyed had not been visited by their caseworker in over two months.[8] Contributing further to the institutional malady was the overall lack of proper screening procedures, which resulted in emotionally disturbed and potentially dangerous children being improperly placed in homes that were unable to provide them with adequate care or monitoring.[9] As a result, the complaint alleged that physical, sexual, and emotional abuse and neglect pervaded the District 10 foster care system.

After the defendants answered the complaint and following months of discovery and negotiations, the parties entered into a settlement agreement and, on January 26, 2000, presented it to the district court. The court approved the settlement agreement and, treating it as a proposed consent decree enforceable

---

District 10's custody were missing.

[8] Another study in 1996 revealed that 58% of foster children in District 10 were not visited monthly by their caseworker and that 77% were not receiving appropriate services. Later that year, a District 10 juvenile court dependency judge captured the general sentiment as to the alarming state of affairs: "I am more than scared, I am petrified relative to the lack of shelter placements and foster homes in District 10. . . . Things are now at the point where children's lives are in danger." Compl. ¶ 62.

[9] In September 1995, the Department studied 177 children receiving targeted case management services (mental health) in District 10. The study revealed that 41% of these children were known to have been sexually abused, a percentage that was significantly higher than those reported in other large metropolitan areas. The study also revealed that 15% of the children had committed sexual assaults. Compl. ¶ 58.

8

through the court's civil contempt power, entered the decree on May 31, 2000.[10]

The decree required the Secretary and the District 10 Administrator to develop and

implement an adequate system of foster care for the dependent children of District

10. The decree also required the Secretary and the District 10 Administrator to

adhere to the commands of the Florida statutes and regulations governing the care

of dependent children[11] and to meet numerous minimum standards regarding the

placement and monitoring of children in foster homes.

B.

On October 28, 2002, counsel for the plaintiff class in <u>Ward</u> brought the

present lawsuit in the district court on behalf of A.P., a District 10 dependent

---

[10] The decree was captioned "Order Approving Settlement Agreement" rather than "Consent Decree." Despite this caption, it had all the indicia of, and was in effect, a consent decree. The order recited that on February 18, 2000, the court, after tentatively approving the settlement as "fair [and] reasonable," and "adequate [to] protect the plaintiff class," had ordered "that notice of the proposed Settlement Agreement be published to class members and that comments or objections be filed by May 18, 2000." A final hearing was held on May 31, 2000, at which the court "considered all comments and objections" and "finally approved" the settlement agreement. The order then stated that "the Court retains jurisdiction for the purposes of enforcing the Settlement Agreement."

[11] The part of the court's order that required the Secretary and the District 10 Administrator to adhere to the commands of the Florida statutes and regulations governing the care of dependent children constituted what we have often treated as an unenforceable "obey the law" injunction. See <u>S.E.C. v. Smyth</u>, 420 F.3d 1225, 1233 n.14 (11th Cir. 2005) ("This Circuit has held repeatedly that 'obey the law' injunctions are unenforceable.") (internal quotation marks omitted). Prosecuting a future violation of a statute or regulation via an order to show cause why the defendant should not be held in civil contempt and sanctioned – which is what the Secretary and District 10 Administrator would face if plaintiffs' counsel wanted them brought to heel for violating a statute or regulation cited in the consent decree – would deny the defendant the process the law provides for such violation.

9

child,[12] against the Department's former Secretary, Edward Feaver, two former District 10 Administrators, including Johnny Brown, seventeen District 10 caseworkers charged with the day-to-day, on-the-ground monitoring of the children in the District's foster care system, and their supervisors between September 15 and November 23, 1998, alleging that A.P. suffered child-on-child sexual abuse while residing in the Calhoun foster home (the "Calhoun home").[13] A.P. sought money damages against each of these defendants, in their individual capacities, under 42 U.S.C. § 1983, on the ground that the defendants effectively caused such sexual abuse and thereby deprived him of his substantive and procedural rights under the Due Process Clause of the Fourteenth Amendment.

A.P.'s case was assigned to the district judge who had entered the consent decree in Ward. Also assigned to that judge was a case brought by District 10 dependents shortly after A.P. filed suit. The plaintiffs were N.M. and R.M., two siblings who joined in one complaint.[14] The complaint sought money damages against Feaver, Brown, another former District 10 administrator, and various District 10 caseworkers and supervisors under § 1983 relying on the same legal

---

[12] Since A.P. was a minor, he sued through his next friend, David S. Bazerman.

[13] The Calhoun home was operated by Joann Calhoun and her ex-husband, Mr. Calhoun, who are not named as defendants. Mr. Calhoun's first name is not revealed in the record.

[14] N.M. and R.M. are minors. Like A.P., they sue through their next friend, David S. Bazerman.

theory A.P. was advancing as a basis for recovering damages for the sexual abuse he suffered while in the Calhoun home. Since the case was similar to A.P.'s case, the court dismissed it without prejudice with leave to replead the claims in a single complaint in the action filed by A.P.[15]

On April 3, 2003, the plaintiffs filed their first amended complaint. The complaint focused on the Calhoun home, alleging that it suffered from many of the ills the Ward complaint had listed as characteristic of District 10: the home was severely overcrowded and housed children with histories of violence and deviant behavior, many of whom had been perpetrators as well as victims of sexual abuse. The complaint alleged that the defendants failed to monitor properly the Calhouns and the children in their care, and that had they followed DCF's procedures and implemented corrective measures, the plaintiffs would not have been abused. The defendants had allegedly acted with deliberate indifference to the significant risk of harm the plaintiffs faced and thereby denied them due process of law.

The defendants severally moved to dismiss the first amended complaint for failure to state a claim upon which relief could be granted.[16] The district court

---

[15] Initially, five additional cases arising from similar events in the Calhoun home were assigned to the same judge. One case was successfully mediated and settled. The remaining four cases were repled in A.P.'s case but subsequently settled. This includes the claim of minor plaintiff R.K., which settled during the pendency of this appeal and was dismissed with prejudice pursuant to the parties' joint motion on June 11, 2008. I confine this discussion accordingly.

[16] See Fed. R. Civ. P. 12(b)(6).

11

referred the motion to a magistrate judge who recommended that the motions be denied. The defendants objected to the recommendation, and on March 30, 2004, following oral argument on their objections, the district court, relying on Ray v. Foltz, 370 F.3d 1079 (11th Cir. 2004), concluded that the complaint should be amended.[17] Like the plaintiffs in Foltz, the plaintiffs before the district court had not alleged that each defendant, individually, actually knew of the substantial risk of harm the plaintiffs faced in the Calhoun home and were deliberately indifferent to such harm. In directing the plaintiffs to amend their first amended complaint, the district court gave them an opportunity to cure that deficiency.

The plaintiffs responded with a second amended complaint (the "complaint") on May 3, 2004. The complaint consisted of 265 pages with 1,355 numbered paragraphs, named as defendants Feaver, Brown,[18] and fifteen individuals involved in the administration of District 10's foster care system, and

---

[17] Ray v. Foltz was a § 1983 damages action brought by the parents of a child who had been murdered in a foster home, R.M., against the three employees in DCF's licensing unit who had been involved in licensing the home. 370 F.3d 1079, 1080–81 (11th Cir. 2004). The defendants, invoking the doctrine of qualified immunity, moved the district court to dismiss the parents' complaint. Id. at 1081. The court denied their motion, and they appealed. Id. We reversed, and remanded the case with the direction that the district court dismiss the complaint because it failed to allege that "the defendants actually knew of the substantial risk of harm to R.M. and that they were deliberately indifferent to it." Id. at 1085.

[18] By this time plaintiffs had dropped their claims against Brown's predecessor, who had been named as a defendant in the earlier complaints.

12

asserted 71 claims for relief.[19] Each defendant moved to dismiss the complaint for failure to state a claim for relief on two grounds: first, the complaint failed to recite facts sufficient to state a constitutional violation against the defendant; and second, assuming a constitutional violation, the defendant was nonetheless entitled to qualified immunity.

On September 17, 2004, the district court entered an omnibus order dismissing all 40 claims brought by the three plaintiffs, A.P., N.M., and R.M., because the allegations were insufficient under Foltz to make out a case of deliberate indifference to a substantial risk of harm.[20] A.P. v. Feaver, No. 02-61534, at 49–50 (M.D. Fla. Sept. 17, 2004) (Omnibus Order on Defs.' Mot. to Dismiss Pls.' Second Am. Compl.) ("Omnibus Order"). The plaintiffs moved the court pursuant to Federal Rule of Civil Procedure 54(b) to enter a final judgment in favor of the defendants on the claims the court had dismissed for failure to state a constitutional violation. The court granted their motion on October 15, 2004, and entered final judgment on those claims. This appeal is from that judgment.[21]

---

[19]  Thirty-one of these claims were brought by J.K. and R.K., who have since settled.

[20]  The court went on to hold that because these claims failed to state a constitutional violation, the defendants were entitled to qualified immunity.

[21]  Though the plaintiffs included all of the dismissed claims in their notice of appeal, they now appeal the district court's ruling on only 36 of the 40 dismissals. The four dismissals which the plaintiffs do not appeal are the dismissal of A.P.'s claim against Richard Walsh and all three of plaintiffs' claims against Pat Spratling.

## II.

The Florida Department of Children and Family Services, headed by the Secretary, is the state executive branch agency that provides services in the areas of economic self-sufficiency; developmental disability; alcohol, drug abuse, and mental health; and children and families. During the pertinent time period, the state was divided into 15 service districts, each headed by a District Administrator.[22] As reflected in the organizational chart appended to this opinion, one of the persons reporting to the District Administrator of District 10 was the Child Welfare Director. A Program Administrator and a number of Family Services Specialists assisted the Child Welfare Director via consultation and administrative support.[23] The Child Welfare Director also supervised three Program Operations Administrators ("POAs") who collectively managed the four units responsible for administering foster care in District 10: "Protective

---

[22] At least one health and human services board existed in each service district for the purpose of encouraging the initiation and support of interagency cooperation and collaboration in addressing family services needs.

[23] Neither the Florida Administrative Code nor the complaint describes the qualifications of a Program Administrator and a Family Services Specialist. The sole mention of a Program Administrator in the complaint is that this person may participate in lieu of the Child Welfare Director in approving foster home capacity waivers, which I describe at part II.B, infra. The complaint alleges that the Family Services Specialists assisted District 10 staff with development and program planning; provided ongoing technical assistance; monitored the provision of children's services; performed quality assurance reviews; ensured that policy guidance was available and understandable to support staff and direct services; and, most pertinent to the case at hand, participated in foster parent re-licensing and the approval of foster home capacity waivers.

14

Investigations," "Licensing," "Placement," and "Foster Care."[24] During the time period covered by the allegations of the complaint, District 10 provided foster care to over 1,000 children in several hundred homes; accordingly, the four units contained numerous Supervisors, Investigators, and Counselors.

The plaintiffs allege in their complaint that they were subjected to child-on-child sexual abuse in the Calhoun home from April 24 until November 23, 1998. Their complaint therefore focuses on District 10's licensing of the foster parent in charge of that home, Joann Calhoun, and the placement and supervision of the plaintiffs and those who allegedly abused them, namely M.M. and D.L., in her home. My discussion is similarly focused. I begin by explaining the process for licensing a foster parent, including Joann Calhoun, prior to the time of the alleged abuse.[25] Next, I explain the process for adjudicating a child a dependent of the State of Florida, identify the District 10 officials involved in the child's custodial placement, and describe the supervision protocol. After that, I review the allegations regarding the placement and supervision of the plaintiffs before us, A.P., N.M., and R.M., and the alleged abusers, M.M. and D.L.[26]

---

[24] Each unit was managed by a different POA, with the exception of the Licensing Unit and the Placement Unit, which were managed by the same POA.

[25] More than one foster parent may be responsible for a foster home. In this case, there was one foster parent, Joann Calhoun.

[26] In the first amended complaint plaintiffs' counsel filed in this case, M.M. and D.L. were alleged to have been victims of child-on-child sexual abuse in the Calhoun home. In their

15

## A. *Licensing*

An applicant seeking a license to operate a foster home was subjected to a comprehensive background investigation conducted by a Licensing Counselor.[27] The investigation centered on the applicant's financial and emotional stability and overall character, and involved a "home study" of the suitability of the applicant's home for foster care. If the results of the investigation favored granting a license, the applicant would participate in a foster parent training program. Then, if she satisfactorily completed the training program, the applicant would receive a license to operate a specific foster home for a designated number of children – the home's capacity.

The license had a term of one year and could be renewed annually. The annual re-licensing process involved a home visit by the Licensing Counselor, who would review the results of the initial home study, consider any relevant information the Foster Care Unit may have acquired in supervising children housed there during the previous year, and report her findings to her Supervisor. Absent an unfavorable report from the Counselor, the Licensing Unit would license the foster parent to operate her home for another year at the same or a different

---

second amended complaint, counsel dropped M.M. and D.L. as plaintiffs and then alleged that they perpetrated the sexual abuse A.P., N.M., and R.M. allegedly sustained.

[27] The Counselor conducted the investigation under the supervision of her Supervisor, who, in turn, answered to the Licensing and Placement POA.

capacity.

Joann Calhoun became a licensed foster parent in 1990.[28]  By 1992, her home had gained a reputation for being able to handle troubled and unruly boys, some with histories of sexual abuse both as a perpetrator and as a victim.  District 10 regarded the Calhoun home as a therapeutic setting, although it was not licensed explicitly as a therapeutic facility.  Over the next six years, until November 23, 1998 – when the incident giving rise to this lawsuit was reported – there were no reported incidents of child-on-child sexual abuse in the home, which housed as many as eleven children at a time, including emotionally disturbed children with histories of sexual and physical aggression.

B.  *Foster Home Placement and Supervision*

A child normally first came within DCF's jurisdiction on a complaint of abuse, neglect, or abandonment.  The complaint was channeled to the Protective Investigations Unit and assigned to a Protective Investigator who looked into the allegations of the complaint under the supervision of a Protective Investigations Supervisor.  If the inquiry yielded "probable cause to support a finding of reasonable grounds for removal and that removal [was] necessary to protect the

---

[28]  The initial licensed capacity of the Calhoun home was two children.  The capacity thereafter fluctuated from time to time on re-licensing.  For example, the capacity was five in 1992, three and later four in 1994, five in 1995, and seven in 1997.  As I explain infra, the number of children residing in the Calhoun home at one time sometimes exceeded the licensed capacity due to the granting of waivers.

17

child,"[29] the Department would take the child into custody. Fla. Stat. § 39.401(1)(b) (1997). If the Department's legal staff agreed with the Investigator that the facts supporting removal sufficiently established probable cause, the Department would then file an emergency shelter petition with the circuit court and request a hearing. Fla. Stat. § 39.401(3).

Thereafter, within 24 hours of the child's removal, a detention or "shelter" hearing had to be convened before the circuit court. Fla. Stat. §§ 39.401(3), 39.402(5)(a).[30] At the hearing, the court would appoint a guardian ad litem ("GAL") to "represent the child" unless it found that "such representation [was] unnecessary." Fla. Stat. § 39.402(7)(a).[31] The court would then hear from the Protective Investigator assigned to the case and the child's custodian to determine whether the "probable cause" standard had been met warranting the child's detention. Id. If the court found that it had, it would order the Department to

---

[29] Reasonable grounds for removal included: "the child has been abused, neglected, or abandoned, or is suffering from or is in imminent danger of illness or injury as a result of abuse, neglect, or abandonment." Fla. Stat. § 39.401(1)(b)(1) (1997).

[30] Broward County is in the Seventeenth Judicial Circuit of Florida. The Broward County Circuit Court is divided into divisions, one being the Juvenile Division. In this opinion, references to the circuit court are to the Juvenile Division of the Broward County Circuit Court.

[31] A GAL is "a responsible adult who is appointed by the court to represent the best interests of the child in a proceeding as provided for by law, who shall be a party to any judicial proceeding as a representative of the child, and who shall serve until discharged by the court." Fla. Admin. Code Ann. r. 65C-13.013(p). Generally, the GAL investigates the child's situation, identifies resources and services, advocates for the child to the court and relevant agencies, and monitors whether court orders or case plans are carried out.

detain the child in a shelter or foster home for a period not to exceed 21 days, unless the child was adjudicated a dependent in the meantime. Id.

If detention was ordered, a petition to have the court adjudicate the child a dependent had to be filed within seven days after the child was taken into custody.[32] Fla. Stat. § 39.402(8) (1997). Unless the parents or legal custodian of the child had admitted the allegations of the petition, the court would convene a hearing to receive the parties' evidence. Id. If the court found that dependency had been proven by a preponderance of the evidence,[33] Fla. Stat. § 39.408(2)(b), it would enter an order adjudicating the child a dependent of the State, Fla. Stat. § 39.409, determine the most appropriate services and placement for the child,[34] and retain jurisdiction over the case for the purpose of reviewing the child's progress, Fla. Stat. § 39.453.

If the court ordered a dependent child placed in foster care, the Protective Investigator would contact the Placement Unit and provide that unit with sufficient

---

[32] The petition may be filed by the Department, through an attorney, or "by any other person who has knowledge of the facts alleged or is informed of them and believes that they are true." Fla. Stat. § 39.404(1).

[33] A dependent includes a child whom the court has found "[t]o have been abandoned, abused, or neglected by the child's parents or other custodians." Fla. Stat. § 39.01(14).

[34] This included placing the child in the temporary legal custody of an adult relative, non-relative, licensed child-caring agency, or the Department. Fla. Stat. § 39.41. Temporary custody lasted until terminated by the court or when the child reached the age of 18. Fla. Stat. § 39.41(2)(a)(8)

19

information about the child to enable it to identify a suitable foster home. If the foster home the Placement Unit selected was operating at its licensed capacity, the Placement Unit would initiate a waiver process; a waiver, if granted, would permit the placement to go forward. [35]

The waiver process proceeded as follows. The Placement Supervisor conferred with the Licensing Supervisor who had been responsible for licensing or re-licensing the foster parent – and thus was acquainted with the home at issue – regarding the appropriateness of the placement. If these Supervisors agreed that an overcapacity waiver would be appropriate, they would submit a written waiver request to the POA of Licensing and Placement, to a Family Services Specialist, and to the Child Welfare Director.[36] Compl. ¶ 41. If these officials agreed that a waiver should issue, they would approve the waiver and the child would be placed in the foster home.

---

[35] The Florida Administrative Code provided:

> Generally there should be no more than five children in a home, including the substitute care parents' own children. These criteria may be varied for good cause and with the written approval of the Family Safety and Preservation program office. If a family has the emotional and physical capacity to nurture more than five children, it is not against policy to establish a capacity above the rule of five. A family must have the physical room and emotional capacity to provide this care.

Fla. Admin. Code Ann. r. 65C-13.011(2)(b). There is no allegation that the approval of the Family Safety and Preservation program office was not obtained with respect to placing more than five children in the Calhoun home.

[36] The Program Administrator could be substituted for the Child Welfare Director.

In deciding whether to grant an overcapacity waiver, the Department's Licensing Manual required that the following questions be addressed:

1.  Is this the only resource available for the children [needing] placement? Have all available homes been considered and has it been determined that this particular home is the most appropriate?
2.  Can the home physically accommodate the additional child/children? This includes a bed, adequate closet space and room for personal possessions.
3.  Can the substitute parents meet the needs of another child or children? Is help, relief, or other support available to the family? Is the family managing well with the children already in the home? Will the addition of another child/children affect the quality of care being given to the children currently in the home?
4.  Can the children already in placement in the home accept additional children? Are there any children in the home who are particularly vulnerable? Can those children be adequately protected?
5.  What is the planned duration of the new capacity? [37]

Once the child was placed in a foster home, a Foster Care Supervisor would assign the child's case to a caseworker, also known as a Family Services Counselor.[38] According to the complaint, the Family Services Counselor was responsible for communicating the child's background information to the foster parents and formulating a plan of care if the child had a history of sexual abuse or

---

[37] Compl. ¶ 42. As the elaborate approval process and multifactor analysis suggest, the Department had a strong presumption in favor of upholding the original licensed capacity of the home as established by the Licensing Unit; granting an overcapacity waiver, therefore, meant that under the circumstances, the addition of a child to a particular foster home would not depreciate the quality of care being provided there.

[38] The formal transfer of the child's case from the Protective Investigations Unit to the Foster Care Unit did not normally occur until after the child had been declared a dependent.

21

victimization in order to guard against further sexual assaults.[39]  Additionally, the counselor was required to visit the child at least monthly[40] and, as alleged in the complaint, assess the safety of the placement and report any concerns about the condition of the foster home to the Licensing Unit or any suspected abuse or neglect to the District's abuse prevention hotline.  If the foster parents ever came to believe that they were no longer able to manage the child in their home, the Family Services Counselor would work with the foster parents and the child to remedy the issues that prompted the removal request and would help facilitate the replacement process if the problems were not corrected.  Fla. Admin. Code Ann. r. 65C-13.010(5)(m).

C.  *Placement of Alleged Abusers M.M. and D.L. in the Calhoun Home*

1.  M.M.'s Placement

On January 6, 1997, 12-year-old M.M., who had an extensive history of psychological problems and violent outbursts, threatened to harm himself and several family members with a knife.  M.M. was thereafter involuntarily committed to an in-patient psychiatric facility.[41]  On January 14, 1997, while M.M.

_____

[39]  The District staff and foster parents were required to "outline a plan of care to handle any special management issues identified in the child's history and assessment" to help prevent sexual assaults from occurring in the foster home.  Fla. Admin. Code Ann. r. 65C-13.015(2)(e).

[40]  "The counselor will visit with the substitute parents and the children in their care at least monthly in their home."  Fla. Admin. Code Ann. r. 65C-13.010(5)(g).

[41]  "Florida Statute § 394.467, known as the Baker Act, allows a person to be placed involuntarily in a treatment facility if clear and convincing evidence indicates that the person is

was in the hospital, DCF received a report that he had sexually assaulted his sister repeatedly over a 3- or 4-year period. Katherine Kaufman, the POA of Protective Investigations, subsequently contacted a contract mental health services provider about placing M.M. in a residential treatment facility. The provider responded that it could only offer M.M. and his family in-home therapeutic services.[42] Thus, upon his release from the hospital, M.M. returned home on January 23, 1997, and began to receive in-home therapy. M.M.'s violent behavior resumed, and fearing for her safety and the safety of her daughter, M.M.'s mother asked that he be removed from her home.

M.M. was placed in the Department's custody at the Lippman Shelter – a short-term residential shelter – on February 3, 1997. On that date, Protective Investigator Susan Worsley was assigned to M.M.'s case and was informed of M.M.'s psychological and behavioral history. Shortly after his placement, on February 12, 1997, Worsley was told that M.M. could no longer remain at the

---

mentally ill, and, inter alia, there is a substantial likelihood that, based on recent behavior, the person will inflict serious bodily harm on himself or another person." Turner v. Crosby, 339 F.3d 1247, 1256 n.7 (11th Cir. 2003).

[42] A 1991 study conducted by the Department reported that 94% of foster care counselors "stated that residential treatment for sexual offenders was either not available in their district or available in a limited area or on a limited basis." Compl. ¶ 50. This shortage apparently had not been alleviated by the time Kaufman inquired about a residential treatment facility for M.M. in January 1997.

23

shelter because of his background and need for 24-hour one-on-one supervision.[43] Worsley therefore contacted the Placement Unit to inquire about a new placement for M.M.; she suggested the Calhoun home. An inquiry was conducted into M.M.'s behavioral history and special needs, as well as the make-up of the five children already in the Calhoun home.[44] An overcapacity waiver to permit M.M. to be placed in the Calhoun home was considered and approved by a Placement Supervisor, by Margaret Andrews (then a Licensing Supervisor), by Sharon Woodroof (a Family Services Specialist), by Jennifer Chang (POA of Licensing and Placement), and by the Child Welfare Director. Accordingly, on February 14, 1997, Worsley placed M.M. with the Calhouns, and on March 24, 1997, M.M. was adjudicated dependant. M.M. was then assigned to Sharon Pollack, a Family Services Counselor; there is no allegation that Pollack failed to perform regular monthly visits to M.M. in the Calhoun home from March 24 through August 1997. Pollack was again assigned to M.M. from May through September 1998; plaintiffs allege that she visited him only once during this time, on June 25, 1998.

---

[43] It is unclear from the complaint who provided the District 10 officials with this information.

[44] In addition to 12-year-old M.M., I deduce from the complaint that the other children in the home were R.D., a 17-year-old child who had lived in the home since 1992; B.J., who was about 17 years old; R.T., who was about 13 years old; and two other children of unknown age, one of whom was R.B.

## 2. D.L.'s Placement

On June 27, 1995, after numerous allegations of abuse, 11-year-old D.L. was adjudicated dependent and placed in the custody of his stepfather. In late August of that year, the Department received a report that D.L. had sexually abused a younger boy who was also residing in his stepfather's home. In addition, the report indicated that D.L. himself was the victim of sexual abuse. D.L. would remain in the home for over a year, until approximately December 6, 1996, when he was removed from his stepfather's custody and placed in a shelter home. D.L. was adjudicated dependent on January 3, 1997, and moved to a foster home four days later.

On April 7, 1997, D.L. admitted to a Department official that he had sexually assaulted three or four young boys who lived near the foster home where he was residing. After the foster parents requested that D.L. be immediately removed, an overcapacity waiver for the Calhoun home was requested and was approved by Department officials, including Woodroof, a Family Services Specialist, and Chang, POA of Licensing and Placement.[45] D.L. was subsequently placed in the Calhoun home by Loubert Desmangles, a Family Services Counselor,

---

[45] Plaintiffs do not identify the other officials involved in the waiver process, but they presumably included a Placement Supervisor, a Licensing Supervisor, and the Child Welfare Director.

on April 8, 1997;[46] the home now housed seven foster children.[47]  There is no

allegation that Desmangles failed to make regular visits to D.L. in the Calhoun

home.[48]  From February 27 to May 5, 1998, Pollack temporarily served as D.L.'s

caseworker; plaintiffs allege that she visited him at the Calhoun home on only one

occasion – March 5, 1998.  Susan Wilburn, another Family Services Counselor,

was then assigned to D.L.'s case from May 12 until September 11, 1998, when she

left the Department.  There is no allegation that Wilburn failed to visit D.L.

regularly.

D.  *Placement of Plaintiffs N.M. and R.M. in the Calhoun Home*

On September 23, 1993, N.M. and his younger brother, R.M., were

adjudicated dependent and placed in their father's custody.  In early June 1994, the

Department received a report that N.M. had been sexually abused by his male

---

[46]  The complaint does not indicate whether Desmangles also served as D.L.'s counselor prior to his placement in the Calhoun home.

[47]  From the complaint, I deduce that in addition to D.L. – who was now twelve years old – the six other children were 17-year-old R.D., 17-year-old B.J., 13-year-old R.T., 12-year-old M.M., and two other children, one of whom may have been in the tenth grade.  R.B. had left the Calhoun home a few days earlier, on April 2, 1997.

[48]  The exact duration of time that Desmangles served as counselor to D.L. is unclear from the complaint.  The complaint suggests that Desmangles was still D.L.'s counselor as of July 1, 1997, but there is no indication of whether he continued to serve in that capacity until Pollack became D.L.'s counselor on February 27, 1998.  Regardless, there is no allegation that whoever served as D.L.'s counselor from July 1, 1997 to February 27, 1998 failed to visit him regularly in the Calhoun home.

babysitter.  Approximately four years later, N.M. and R.M. were moved from their father's home to shelter care and, on April 6, 1998, placed in the legal and physical custody of the Department.  Due to their behavioral problems, 8-year-old N.M. and 5-year-old R.M. were placed in several different foster homes before arriving at the Calhoun home on April 24 and May 6, 1998, respectively.  Eleven foster children were now living in the Calhoun home.[49]  From May 21 through September 11, 1998, Wilburn served as Family Services Counselor to N.M. and R.M., in addition to D.L.[50]  There are no allegations that she failed to visit these three children regularly in the home.

E.  *Home by Home Review*

In August of 1998, the Department began a Home by Home Review of approximately 50 "high priority" homes that District 10 identified as being

---

[49]  Plaintiffs allege that no overcapacity waivers were requested for N.M. or R.M. at the time "as no waiver could be approved"; according to the complaint, this was because the May 16, 1997 re-licensing of the Calhoun home had restricted the home to the seven children already living there.  The Calhoun home was re-licensed on June 1, 1998.  A waiver for R.M.'s placement in the Calhoun home was subsequently approved on November 23, 1998, with Corinne Millikan, a Family Services Specialist, allegedly participating in the approval.  The complaint does not allege when the waiver for N.M.'s placement was approved.

According to the complaint, granting an overcapacity waiver after the child had been placed in the foster home violated Department policy.

[50]  The complaint does not indicate who subsequently became counselor to N.M., R.M., and D.L., but there is no specific allegation that these three children were not assigned a caseworker between September 11, 1998 and November 23, 1998.

overcapacity or having had some previous report of abuse or neglect. Woodroof and Chang had designated the Calhoun home as one of the high-priority homes to be reviewed. As part of the Review, multiple foster children in the Calhoun home were interviewed, the foster children's records were inspected, and the home's licensing records were examined. On September 8, 1998, the results of the Review were issued in a report, copies of which went to Feaver, Brown, Kaufman, Millikan, Woodroof, and Chang. Compl. ¶ 147.

Among other things, the report described the Calhoun home as "cramped," with eight children, two of whom, D.L. and M.M., had histories of sexual perpetration and mental health problems.[51] M.M., D.L., and others required the frequent attention of mental health technicians visiting the home. Notably, N.M. was one of the children who was interviewed by the reviewers; his claim of maltreatment was that "everyone at the home was mean to him." Compl. ¶ 144. The Review contained no report of child-on-child sexual abuse in the Calhoun

---

[51] The following information was documented about the Calhoun home in the report: (1) eleven individuals resided in the Calhoun home – Mr. Calhoun, Joann Calhoun, their son G. Brock (one of the Calhouns' natural children who was living in the home at the time), and eight foster children; (2) the house was "cramped" and there were often up to three mental health technicians in the home visiting the children; (3) Mr. Calhoun would discipline one of the children by spanking; (4) D.L. had a history of sexual perpetration; (5) M.M. had a history of sexual and physical aggression; (6) D.L. should not be allowed to sleep in the same room with younger children; and (7) N.M. informed the reviewers that everyone in the house was mean to him. The report also noted that previously there were multiple "direct[ives] to limit the number of children and reduce capacity" that had not been followed. Compl. ¶¶ 144–45.

home.  District 10 responded to the report's findings by preparing and implementing "Corrective Action Plans" for each of the 50 homes.

F.  *Placement of A.P. in the Calhoun Home and Report of Sexual Abuse*

Around May 11, 1998, A.P. was ordered into the legal and physical custody of the Department.  Eight-year-old A.P. had a documented history of sexual victimization and perpetration, having previously acted out sexually on his younger sister.  A.P. was placed in the Calhoun home on September 17, 1998, which brought the total number of foster children to nine. [52]

A waiver approving A.P.'s placement in the Calhoun home was obtained about eleven days later; Corinne Millikan, a Family Services Specialist, was allegedly one of the persons who participated in the approval.

On November 23, 1998,[53] A.P. told his natural mother's therapist that he was being subjected to repeated sexual abuse by the other foster children in the Calhoun home, particularly by M.M. and D.L.[54]  This information was immediately

---

[52]  Three children had left the home since the placements of N.M. and R.M. on April 24 and May 6, 1998, respectively.

[53]  The population of the Calhoun home had risen to thirteen foster children by this time.

[54]  The complaint alleges that A.P., N.M., and R.M. were all subjected to regular abuse from the time of their placement in the Calhoun home until their removal.

29

reported to the abuse prevention hotline,[55] and A.P. was removed from the Calhoun home on November 23, 1998.

On November 24, 1998, an emergency meeting was called before Judge Birken, who concurred in the Department's decision to remove A.P. from the home. Pursuant to a court order, N.M. and R.M. were removed from the Calhoun home that same day, and 24-hour "awake" supervision was imposed on the home to prevent any further child-on-child sexual activity. The Department also immediately commenced an investigation into the allegations. The investigation concluded on December 3, 1998, with a finding that there were "no indicators of abuse." The 24-hour awake supervision was subsequently canceled on December 11, 1998. Several months later, a second abuse report was made to the hotline on March 22, 1999, alleging that N.M. and R.M. had also been sexually abused during the time that they had lived in the Calhoun home. A 2-day investigation verified that there was child-on-child sexual abuse occurring in the home, and the remaining children were removed on March 25, 1999.

III.

Each of the 40 claims dismissed by the district court was dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which

---

[55] See Fla. Stat. § 415.504 (requiring anyone "who knows, or has reasonable cause to suspect, that a child is an abused, abandoned, or neglected child" to report "such knowledge or suspicion to the department").

relief can be granted. A motion to dismiss under Rule 12(b)(6) should be granted when a defendant is found to be immune from suit due to qualified immunity. See Williams v. Bd. of Regents, 477 F.3d 1282, 1300 (11th Cir. 2007). An order granting a motion to dismiss on the basis of qualified immunity is reviewed de novo by applying the same standard as the district court did, "accepting all allegations as true and construing facts in a light most favorable to the plaintiff[s]." GJR Invs., Inc. v. County of Escambia, 132 F.3d 1359, 1367 (11th Cir. 1998). However, such acceptance should not be given blindly; only well pleaded factual allegations are taken as true and only reasonable inferences are drawn in favor of the plaintiff. See Oladeinde v. City of Birmingham, 963 F.2d 1481, 1485 (11th Cir. 1992); Marrero v. City of Hialeah, 625 F.2d 499, 502 (5th Cir. 1980);[56] see also Long v. Satz, 181 F.3d 1275, 1278 (11th Cir. 1999) (per curiam) ("reasonable inferences"); Associated Builders, Inc. v. Ala. Power Co., 505 F.2d 97, 100 (5th Cir. 1974) ("unwarranted deductions of fact are not admitted as true"). A plaintiff must allege more than mere "labels and conclusions"; the complaint must include "[f]actual allegations . . . [sufficient] to raise a right to relief above the speculative

---

[56] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

31

level." Bell Atl. Corp. v. Twombly, 550 U.S. ___ , 127 S. Ct. 1955, 1964–65, 167 L. Ed. 2d 929 (2007) (citations and internal quotations omitted). Indeed, "any conclusory allegations, unwarranted deductions of fact or legal conclusions masquerading as facts do not prevent dismissal." Weissman v. Nat'l Ass'n of Sec. Dealers, 500 F.3d 1293, 1305 (11th Cir. 2007) (en banc) (Tjoflat, J., dissenting) (citing Associated Builders, Inc., 505 F.2d at 99).

While Rule 8 allows a plaintiff a great deal of latitude in the manner in which a complaint presents a claim,[57] this court has implemented more stringent pleading requirements in § 1983 actions in which qualified immunity is likely to be raised as a defense. See Swann v. S. Health Partners, Inc., 388 F.3d 834, 838 (11th Cir. 2004) (noting that the heightened pleading standard for qualified immunity cases survives the Supreme Court's decision in Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993), which struck down the heightened pleading requirement in non-qualified immunity § 1983 suits).[58] This heightened specificity

---

[57] Fed. R. Civ. P. 8(e)(1) (2006) provides that "[e]ach averment of a pleading shall be simple, concise, and direct. No technical forms of pleading or motions are required."

[58] For an additional discussion of the Swann opinion and qualified immunity, see Weissman v. National Association of Securities Dealers, 500 F.3d 1293, 1309 n.6 (11th Cir. 2007) (en banc) (Tjoflat, J., dissenting).

is necessary so that the court has sufficient factual allegations to allow it to assess whether a defendant's actions violated a clearly established right. GJR Invs., Inc., 132 F.3d at 1367. If it is impossible to make this determination from the face of the plaintiff's complaint, the purpose of the qualified immunity defense – shielding government officials from the demands of defending oneself from damages suits – may well be frustrated. [59]

IV.

It is undisputed that the actions of which plaintiffs complain were undertaken by the defendants in the course of their "discretionary functions." See Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004) (considering whether the official engaged in acts "of a type that fell within the employee's job responsibilities"). Therefore, to overcome the defendants' entitlement to qualified immunity, plaintiffs must demonstrate that (1) the defendants violated their federal constitutional or statutory rights, and that (2) those rights were clearly established at the time of the defendants' actions. Lee v. Ferraro, 284 F.3d 1188, 1194 (11th

---

[59] Qualified immunity "is an immunity from suit rather than a mere defense to liability," Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S. Ct. 2806, 2815, 86 L. Ed. 2d 411 (1985), and therefore its purposes would be "thwarted if a case is erroneously permitted to go to trial." Harrell v. Decatur County, 22 F.3d 1570, 1578 (11th Cir. 1994) (Dubina, J., dissenting), vacated by 41 F.3d 1494 (11th Cir. 1995) (per curiam) (adopting Judge Dubina's dissenting opinion).

Cir. 2002); <u>Vinyard v. Wilson</u>, 311 F.3d 1340, 1350 (11th Cir. 2002).

The complaint in this case does not allege that any of the defendants directly participated in the sexual abuse that the plaintiffs allegedly suffered; that is, they were not the direct instruments of the abuse. Rather, plaintiffs claim that it was the defendants' failure to act on plaintiffs' behalf, their failure to follow DCF guidelines and regulatory mandates and to heed warnings, that led to the abuse. Plaintiffs' argument is, in short, that the defendants each were positioned either to prevent the abuse from occurring or to curtail further abuse once it had begun and, by failing to do so, violated the substantive component of the Due Process Clause of the Fourteenth Amendment.

As an initial matter, it is important to expound upon the difference between a § 1983 suit seeking injunctive relief and the case before us, a § 1983 suit for damages. The defendant-officials in a suit for injunctive relief, as was the case in <u>Ward v. Feaver</u>, are those individuals who have the power to provide the plaintiffs with an adequate remedy – not necessarily the officials who actually violated the plaintiffs' rights. The latter question is largely irrelevant in the equitable relief context; that is, it does not matter who specifically violated the rights of the plaintiffs, merely that the plaintiffs are suffering an ongoing violation of their

34

rights and the defendants before the court have the authority to stop it from continuing.

In a suit for damages, on the other hand, the crucial inquiry is whether each of the defendant-officials personally violated the plaintiffs' constitutional rights. Individual liability under § 1983 cannot arise vicariously through a theory of respondeat superior. Monell v. Dep't. of Soc. Servs. of New York, 436 U.S. 658, 690–95, 98 S. Ct. 2018, 2035–38, 56 L. Ed. 2d 611 (1978); Holloman ex rel. Holloman, 370 F.3d at 1290. Without the liability-extending tool of respondeat superior, "[s]upervisory officials cannot be held liable under § 1983 for the unconstitutional actions of their subordinates[.]" Gray v. Bostic, 458 F.3d 1295, 1308 (11th Cir. 2006). However, the absence of vicarious liability does not foreclose holding a supervisor independently liable if he or she acts in a deliberately indifferent manner toward the plaintiff. Greason v. Kemp, 891 F.2d 829, 836–37 (11th Cir. 1990).[60]

---

[60] Under the "extremely rigorous" standard for holding a supervisor liable in his individual capacity, supervisory liability is only appropriate "when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." Cottone v. Jenne, 326 F.3d 1352, 1360–61 (11th Cir. 2003). "The necessary causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so," or "when a supervisor's custom or policy . . . result[s] in deliberate indifference to constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully and failed to stop them from doing so."

Having noted this distinction, I proceed to set forth the standard for establishing a violation of a federal constitutional or statutory right in a § 1983 suit for damages against a government official in his or her individual capacity.

A.

"[T]he right to personal security constitutes a historic liberty interest protected substantively by the Due Process Clause" from government infringement.  See Youngberg v. Romeo, 457 U.S. 307, 315, 102 S. Ct. 2452, 2458, 73 L. Ed. 2d 28 (1982) (internal quotation marks omitted).  That right is not extinguished by confinement in a prison, Hutto v. Finney, 437 U.S. 678, 98 S. Ct. 2565, 57 L. Ed. 2d 522 (1977); commitment to a mental institution, Youngberg, 457 U.S. at 315–16, 102 S. Ct. at 2457–58; or, most pertinently, placement in foster care, Taylor v. Ledbetter, 818 F.2d 791, 797 (11th Cir. 1998) (en banc).  This liberty interest, however, is not absolute; the proper question is "not simply whether a liberty interest has been infringed but whether the extent or nature of the . . . lack of absolute safety is such as to violate due process."  Youngberg, 457 U.S. at 320, 102 S. Ct. at 2460.  Therefore, whether an individual's due process right has been violated is determined by weighing "'the liberty of the individual'"

Id. (citations and internal quotation marks omitted).

36

against "'the demands of an organized society.'" Taylor, 818 F.2d at 795 (quoting

Youngberg, 457 U.S. at 320, 102 S. Ct. at 2460).

To achieve the proper balance between the interests of the state and the

rights of a child in foster care, this court adopted the "deliberate indifference"

standard. Id. at 795–97 (applying the "deliberate indifference" standard of Estelle

v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976), to the foster care

context). Under this standard, to establish a constitutional violation, "it [must be]

alleged . . . that the state officials were deliberately indifferent to the welfare of the

child." Foltz, 370 F.3d at 1083 (internal quotation marks omitted). To put it

differently, a constitutional violation occurs if the plaintiffs' "injuries were

proximately caused by the deliberate indifference of officials to known risks."

Omar v. Lindsey, 243 F. Supp. 2d 1339, 1343 (M.D. Fla. 2003), aff'd on basis of

district court opinion, 334 F.3d 1246 (11th Cir. 2003).

Because deliberate indifference requires a much higher standard of fault than

mere or even gross negligence, see Bozeman v. Orum, 422 F.3d 1265, 1272 (11th

Cir. 2005), the risk involved must be of sufficiently serious magnitude – a

substantial risk of serious harm, which in this context denotes a "strong likelihood"

of serious harm. See Cook v. Sheriff of Monroe County, 402 F.3d 1092, 1115

(11th Cir. 2005) ("[D]eliberate indifference requires that the defendant deliberately disregard a <u>strong likelihood</u> rather than a mere possibility that the . . . harm will occur.") (internal quotation marks omitted); <u>see also</u> <u>Stinson v. County of Montgomery</u>, No. 07-15671, 2008 WL 2610762, at *5 (11th Cir. July 3, 2008) (unpublished) (noting that "mere general calls for staff assistance and assertion that C.P. was 'messing with' him were not enough to inform the Officers that [plaintiff] faced a <u>substantial</u> risk of <u>serious</u> harm").

Furthermore, the Supreme Court has expressly rejected "an objective test for deliberate indifference" in favor of a subjective approach. <u>Farmer v. Brennan</u>, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979, 128 L. Ed. 811 (1994). An official acts with deliberate indifference only when he disregards a substantial risk of serious harm "of which he is <u>actually aware</u>." <u>Foltz</u>, 370 F.3d at 1083 (citing <u>Farmer</u>, 511 U.S. at 836, 114 S. Ct. at 1978). It is not enough to show that an official is "aware of facts from which the inference <u>could</u> be drawn that a substantial risk of serious harm exists"; "he must also draw the inference." <u>Farmer</u>, 511 U.S. at 837, 114 S. Ct. at 1979 (emphasis added); <u>see also</u> <u>Burnette v. Taylor</u>, No. 07-11061, 2008 WL 2685678, at *4 (11th Cir. July 10, 2008) ("No liability arises under the Constitution for an official's failure to alleviate a significant risk that he should

38

have perceived but did not . . . . As such, imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. Each individual Defendant must be judged separately and on the basis of what that person knows.") (citation and internal quotation marks omitted).

Nor is it enough for a plaintiff to demonstrate a defendant's subjective knowledge of a substantial risk of serious harm; the plaintiff must also show that with that knowledge, the defendant nonetheless knowingly or recklessly "disregard[ed] that risk by failing to take reasonable measures to abate it." Hale v. Tallapoosa County, 50 F.3d 1579, 1583 (11th Cir. 1995) (internal quotation marks omitted); see also Farmer, 511 U.S. at 844, 114 S. Ct. at 1982–83 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."). Implicit in that inquiry is the requirement that the defendant must have known of feasible "means to cure that condition, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." LaMarca v. Turner, 995 F.2d 1526, 1536 (11th Cir. 1993) (internal quotation marks omitted); see also Hale, 50 F.3d at 1583 ("[U]nder this standard, a jury could reasonably find that [the defendant] failed to

take reasonable measures to abate a known risk of harm if the evidence showed that he knew of ways to reduce the harm but knowingly declined to act, or that he knew of ways to reduce the harm but recklessly declined to act.") (internal quotation marks omitted).  The court must remain mindful of the need to avoid "second-guessing the difficult choices that . . . officials must face and of improperly extending deliberate indifference standards to mere inadvertence or errors in good faith."  Hale, 50 F.3d at 1584 (internal quotation marks omitted).

Therefore, in order to establish deliberate indifference, a plaintiff must allege that the defendant had (1) subjective knowledge of a substantial risk of serious harm, and yet (2) disregarded that risk (3) "by conduct that is more than mere" or gross negligence.  See McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999); Bozeman, 422 F.3d at 1272.[61]  In short, our task in this case is to

---

[61]  Ray v. Foltz mistakenly cites McElligott as requiring a defendant to be "objectively aware of a risk of serious harm."  370 F.3d 1079, 1083 (11th Cir. 2004) (emphasis added).  And this error appears to have been replicated by later decisions.  See, e.g., Nichols v. Maynard, 204 Fed. Appx. 826, 828 (11th Cir. 2006) (unpublished) (noting that plaintiffs are required to allege that the defendant "was objectively aware of a risk of serious harm." (quoting Ray, 370 F.3d at 1083 (citing McElligott, 182 F.3d at 1255))); Lavender v. Kearney, 206 Fed. Appx. 860, 863 (11th Cir. 2006) (unpublished) (same); Maldonado v. Snead, 168 Fed. Appx. 373, 379 (11th Cir. 2006) (unpublished) (same).  Though these decisions appear to apply the proper subjective test despite this error, I hope that this discussion will add further clarity to this difficult area of the law.

To be sure, there is a related objective component to the standard; it would not be enough for the defendant subjectively to believe his conduct created a substantial risk of serious harm, if in fact no such risk was created.  The facts of which the defendant is subjectively aware must also be such that "the inference could be drawn that a substantial risk of serious harm exists."  Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979, 128 L. Ed. 811 (1994) (emphasis

40

determine what each defendant actually knew prior to the alleged abuse and what

actions he or she took in response to that knowledge.

B.

In the case at hand, the crux of our deliberate indifference analysis is

whether, prior to the alleged abuse reported on November 23, the defendant-

official possessed subjective knowledge that the plaintiffs faced a substantial risk

of child-on-child sexual abuse in the Calhoun home – the first prong of the

McElligott test. Only if the complaint sufficiently alleges, under our heightened

pleading standard, that the defendant possessed this actual awareness can we then

evaluate the sufficiency of the actions he or she took in response – the second and

added); see also Marsh v. Butler County, 268 F.3d 1014, 1030 (11th Cir. 2001) ("We conclude that Plaintiffs adequately allege 1) an objective, substantial risk of serious harm to inmates existed, 2) the Sheriff was subjectively aware of this risk . . . ."); Purcell v. Toombs County, 400 F.3d 1313 (11th Cir. 2005) (finding that "[t]he record does not support Purcell's contentions that the conditions – bearing everything in mind – rose to the level of a substantial or sufficiently serious risk as opposed to some lesser risk of harm") (internal quotation marks omitted). It is this latter, objective inquiry that informed our disposition of Jorge T. v. Florida Department of Children and Families, 250 Fed. Appx. 954 (11th Cir. 2007) (unpublished). In that case, Jorge T. brought a § 1983 claim against seven DCF employees after Julian, another foster child living in the home in which Jorge T. had been placed, sexually assaulted him in the home's bathroom. Id.. at 955. In determining whether the defendants were immune from suit, we put aside as irrelevant the plaintiff's various allegations that "one DCF employee received reports that Jorge T. and his brother were not well-kept, were dirty and lacked proper care"; that "the defendants failed to respond to various structural errors and a general increase in reports of abuse in the foster care system"; and that "the defendants improperly screened Jorge T.'s foster mother's background." Id.. The only relevant and specific allegation was that "one of the seven defendants knew that Julian had previously entered the bathroom [several times] when it was occupied by Jorge T.," which we concluded was insufficient "to support the inference that a substantial risk of serious harm to Jorge T. existed." Id. at 955–56.

third prongs of McElligott.

To guide this decision, I look to some of the cases that have addressed what constitutes subjective knowledge of a substantial risk of serious harm. In other words, what facts or circumstances must be pled in order to allege sufficiently that the government official actually knew of a strong likelihood that future serious harm would befall the plaintiff? I first canvass cases in the foster care context, and then consider the relevance of cases arising from the analogous context of prisoners and pretrial detainees.

1.

The cases that I review from the foster care context – both published and unpublished – all concern § 1983 suits filed by or on behalf of children against employees of the DCF on the basis of abuse from their foster parents or other children in the foster homes. The complaint in Omar v. Lindsey, 243 F. Supp. 2d 1339, 1343 (M.D. Fla. 2003), aff'd on basis of district court opinion, 334 F.3d 1246 (11th Cir. 2003), easily satisfied the first prong of McElligott. In that case, the plaintiff alleged that the defendants placed the child in an inappropriate foster home and allowed him to be adopted by an abusive parent, resulting in a "childhood of unremitting and intense abuse." Id. at 1342. In denying the

defendants' motion to dismiss, the court found that the foster child's "repeated alleg[ations] that Defendants knew that Plaintiff was being egregiously abused" by his foster mother constituted sufficient notice under the deliberate indifference analysis. Id. at 1343.

Other than Lindsey, none of the remaining cases involved allegations that were sufficient to satisfy McElligott's requirement of subjective knowledge. Ray v. Foltz, 370 F.3d 1079 (11th Cir. 2004), which involved a child who had been neglected and abused by his foster parents, stands for the proposition that neither the negligent failure to gather information that would have led to the discovery of adverse information about the foster parents,[62] nor the negligent failure to follow certain DCF guidelines and procedures,[63] are sufficient to demonstrate deliberate indifference in the absence of allegations that the defendants actually knew of a

[62] In support of their deliberate indifference claim, plaintiffs allege that "the defendants failed to take various actions that, if taken, would have led to the discovery of adverse information about the [foster parents] and their fitness to serve as foster parents," and "ignored certain adverse information about the [foster parents] and their fitness to serve as foster parents," such as two previous abuse reports in regards to another child. Foltz, 370 F.3d at 1084 & n.5.

[63] Plaintiffs allege that the defendant-officials "violated certain Department guidelines and procedures in licensing the [foster] home, which both allowed [the child] to be placed in a dangerous environment for foster children, and aggravated the likelihood that he would be abused there," Foltz, 370 F.3d at 1081, and also "failed to require the [foster parents] to complete certain training that might have produced more information about them and violated Department rules by placing too many children in that home." Id. at 1084.

43

substantial risk of serious harm or "deliberately chose not to learn of the abuse." Id. at 1085.

In both Omar v. Babcock, 177 Fed. Appx. 59 (11th Cir. 2006) (unpublished), and Maldonado v. Snead, 168 Fed. Appx. 373 (11th Cir. 2006) (unpublished), there was no evidence that the defendants' failure to draw the inference that the minor children were being abused "was anything other than an unfortunate miscue." See Omar, 177 Fed. Appx. at 64. To establish that the officials were on notice of a serious risk of abuse, the plaintiff in Omar presented evidence that after he was placed in the foster home, but before his adoption was approved by the Department, the suspicion of abuse was raised but later dismissed by the Department after a doctor found multiple "loop marks" on the plaintiff's body and was "concerned that these marks might have resulted from abuse." Id. at 61. Additionally, the plaintiff alleged that the officials were aware that he displayed evidence of various psychological problems and physical illness following his placement. Id. at 61–64. These allegations were held to be an insufficient predicate for a claim of deliberate indifference because "there was no evidence . . . that any of the [defendants] actually drew the inference that these facts meant [the child] was being abused." Id. at 63–64. The court in Maldonado

44

likewise concluded that the evidence was too weak to support the allegation that defendants were actually aware of the risk of harm to the plaintiff prior to her injury. 168 Fed. Appx. at 383–85 (considering a sore which the child's doctor concluded was impetigo, rather than a cigarette burn; a cut described in an incident report as a "small gash under left eye," possibly caused accidentally from playing with a toy; and a statement made by the aggressor after the child's injury had occurred).

In Nichols v. Maynard, 204 Fed. Appx. 826 (11th Cir. 2006) (unpublished), in which a 5-year-old foster child was sexually abused by an older foster child, JK, we concluded both that the defendants were not subjectively aware of a substantial risk of serious harm, and that they did not recklessly disregard any such risk. The complaint made two allegations that were the focus of the court's review. First, it alleged that the officials "deliberately and recklessly disregarded adverse information regarding JK's background of sexually acting out and deliberately ignored the obvious, serious risk of harm JK's placement . . . presented to [plaintiff] and the other children in the foster home." Id. at 828 (internal quotation marks omitted). In support of this allegation, the plaintiff asserted that the officials had actual knowledge of the following facts: (1) "JK had sexually acted out in at

least five prior foster homes"; (2) "JK got into bed naked with one of his foster parents' natural sons"; and (3) "JK had been sexually victimized numerous times in prior foster homes." Id. at 828–29 (internal quotation marks omitted). Second, the complaint alleged that the defendants "deliberately violated their own department guidelines by placing JK, in an already overcrowded home, in a bedroom with younger children." Id. at 828.

Observing that "the records indicate that JK's part in sexual abuse had been as a victim, not an aggressor," we concluded that the alleged facts did not demonstrate that the defendants were on notice of "any serious risk of harm to [the 5-year-old child]." Id. at 829. Moreover, even assuming that the defendants had been aware of a substantial risk of serious harm, the allegations describing the defendants' actions showed that the defendants did not recklessly disregard that risk through their conduct. Id. Three days after placing JK in the home, the defendants had "informed the foster parents of JK's history of being a sexual abuse victim," and that after the sexual abuse incident occurred months later, the defendants "removed JK and conducted an investigation into the incident." Id.

2.

In addition to our foster care decisions, prison cases are also instructive on

the issue of notice because these decisions originally served as the theoretical underpinnings of our decision in <u>Taylor</u> – which first recognized a child's constitutional right to physical safety and freedom from unnecessary harm while in foster care. However, it is important to note a caveat that must be observed when considering these cases. Although we recognized in <u>Taylor</u> that foster homes are sufficiently "analogous" to penal institutions to support a § 1983 action, we cautioned that the contexts "are not parallel." 818 F.2d at 796. We echoed the Second Circuit's earlier observations in <u>Doe v. New York City Department of Social Services</u>, 649 F.2d 134 (2d Cir. 1981):

> There is a closer and firmer line of authority running from superiors and subordinates within [a penal] institution than exists in the foster care context, particularly in respect of the relationship between agency personnel and the foster parent. [Prison] administrators can readily call in subordinates for consultation. They can give strict orders with reasonable assurance that their mandates will be followed, and as added insurance other employees stationed in proximity of the subordinates to whom orders are directed may be instructed to monitor compliance.
>
> By contrast, the [foster care agency] had to rely upon occasional visits for its information gathering, and its relationship to the foster family was less unequivocally hierarchical than is the case with prison guards and a warden.

<u>Id.</u> at 142; <u>see also</u> <u>Taylor</u>, 818 F.2d at 796 ("Obviously, a closer relationship exists between superior officers, subordinate officers, and the inmates within a

prison than exists between a state agency, the foster parents, and the foster child in a foster care setting. In a penal institution, all the persons involved are in close and daily contact. Wardens and supervisors have the ability to daily monitor the activities of subordinates as well as the effect of certain conduct upon inmates.").[64] Simply put, it is the foster care parents, not DCF officials, who are comparable to the prison warden and guards; the foster parents are the ones with primary responsibility for the safety of the children. Certain DCF officials are more analogous to officials in the Federal Bureau of Prisons whose posts are remote from the correctional facility. Based on this distinction, we asserted that "[t]he lack of proximity in the foster home [between the children and state officials] . . . suggests that deliberate indifference is not as easily inferred or shown from a failure to act." Taylor, 818 F.2d at 796. Children in plaintiffs' situation consequently "will be faced with the difficult problem of showing actual knowledge of abuse or that agency personnel deliberately failed to learn what was occurring in the foster home." Id.

---

[64] Furthermore, as noted by the partial dissent in Taylor, there are also normative pressures constricting the supervisory role of officials in the foster care context that their counterparts in prisons do not face. "[T]o give the child a normal family environment, foster care officials understandably feel 'constrained to respect the foster family's autonomy and integrity[,] and [feel] pressured to minimize intrusiveness,'" a pressure that prison officials do not feel as "their role is to monitor and control an inmate's environment and activities on a day-to-day basis. Consequently, prison officials will normally have more information available to them about the conditions of an inmate's confinement than officials overseeing foster care will have about the conditions of a foster home placement." Taylor, 818 F.2d at 815 (Tjoflat, J., concurring in part and dissenting in part) (quoting Doe v. New York City Dep't of Soc. Servs., 649 F.2d 134, 142 (2d Cir. 1981)) (alterations in original).

In view of this distinction, prison cases more effectively elucidate the kind of allegations that do not sufficiently allege subjective awareness on the part of state officials in the foster care context, than those that do. To put it differently, allegations that fail to establish subjective awareness in the prison context are also generally insufficient to establish subjective awareness in the foster care context, but allegations that properly allege subjective awareness in the prison context are not necessarily adequate in the foster care context. With this in mind, I turn to the prison cases.

In Carter v. Galloway, 352 F.3d 1346 (11th Cir. 2003), an inmate asserted a § 1983 claim for damages against prison officials for allowing him to remain in the same cell as another inmate who subsequently attacked him. Id. at 1349. In finding that the plaintiff failed to establish that the officials had "a subjective awareness of a substantial risk of serious physical threat," id. at 1350, we were unpersuaded that the following allegations constituted sufficient notice: (1) the officials "clearly knew" that the plaintiff's cellmate was a "problem inmate" who had "a well-documented history of prison disobedience and had been prone to violence"; and (2) the officials had "specific notice" that the inmate was "act[ing] crazy, roaming his cell like a caged animal," was planning to fake a hanging in

49

order to be transferred to the medical prison, and had informed the plaintiff that he would have to help with the fake hanging "one way or another." Id. at 1349. (internal quotation marks omitted). We explained that "before Defendants' awareness arises to a sufficient level of culpability, there must be much more than mere awareness of [the inmate]'s generally problematic nature"; "the prison official must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists – and the prison official must also draw that inference." Id. (emphasis added and internal quotation marks omitted). We observed that although the plaintiff had complained to the defendants many times about his cellmate's "crazy" actions, the "Plaintiff never told [the defendants] that Plaintiff feared [his cellmate] or that [his cellmate] clearly threatened Plaintiff." Id. In short:

> Defendants only possessed an awareness of [the attacker's] propensity for being a problematic inmate; to find Defendants sufficiently culpable would unduly reduce awareness to a more objective standard, rather than the required subjective standard set by the Supreme Court. Such a generalized awareness of risk in these circumstances does not satisfy the subjective awareness requirement.

Id. at 1350; see also id. (noting that the defendant-official remained "unaware of a particularized threat or fear felt by Plaintiff in regards to rooming with [the aggressor]," and that allegations of "a generalized awareness of risk" are

50

insufficient to meet the subjective awareness requirement) (emphasis added).

In <u>Marsh v. Butler County</u>, 268 F.3d 1014 (11th Cir. 2001) (en banc), two former inmates brought a § 1983 suit against the county and sheriff to recover for injuries they sustained when assaulted by other prisoners, alleging that the conditions at the jail posed a substantial risk of serious harm to inmates, specifically the risk of inmate-on-inmate attacks. <u>Id.</u> at 1023–24. Amidst the parade of horribles presented in the complaint, we focused on certain allegations that indicated the inmates had ready access to makeshift weapons fashioned "by cannibalizing parts of the decaying building"; that the guards were unable to lock down the free-roaming inmates because the locks to cell doors did not work; and that there was no visual or audio surveillance of inmates – indeed, "jailers were afraid to conduct visual inspections." <u>Id.</u> at 1024–25, 1028. Consequently, the inmates, who were mostly housed on the second floor of the building, had no "means to contact guards other than by screaming or banging on the walls." <u>Id</u>. at 1025.[65] In support of their deliberate indifference claim against the sheriff in her

_____

[65] The complaint also alleged that the prisoners "were not screened for mental health, medical conditions or conflicts with other prisoners before entering the Jail"; once inside, "there was no segregation of nonviolent inmates from violent inmates, pretrial detainees from convicted criminals, juveniles from adults, or inmates with mental disorders from those without mental disorders"; "the Jail was routinely understaffed," with often only one jailer on duty at a time; "prisoners were not disciplined or segregated when they attempted to escape, threatened jailers, destroyed property or assaulted other inmates"; and "no head counts of prisoners were made to

individual capacity, the plaintiffs alleged that the sheriff was subjectively aware of the risk and offered evidence that she was provided with (1) "faultfinding, inspection reports by state agencies, reports outlining the conditions that existed at the Jail"; (2) "many complaints from prisoners and requests for assistance"; (3) "correspondence from prisoners' lawyers detailing the staffing problems and warning of a 'serious threat to the safety of inmates'"; and (4) "a lawsuit filed in the district court [prior to the attacks], seeking injunctive and declaratory relief on behalf of the inmates at the Jail." Id. at 1029. Additionally, the plaintiffs alleged that the dangerous conditions at the jail were "longstanding and pervasive." Id. In light of these allegations, we held that the plaintiffs had sufficiently pled that the sheriff was "subjectively aware of the substantial risk to inmate safety at the Jail." Id.

What I discern from Marsh is that the alleged prison conditions and the notice provided to the defendant were of such a nature that the inference that the defendant subjectively knew of a substantial risk of inmate-on-inmate attack was inescapable. In other words, "a substantial risk of inmate attacks was longstanding, pervasive, well-documented, [and] expressly noted by prison

_____

make sure they were all accounted for." Marsh, 268 F.3d at 1029.

52

officials in the past, and the circumstances suggest[ed] that [the defendant] had been exposed to information concerning the risk and thus <u>must</u> have known about it" – not merely that "a reasonable person <u>would</u> have known, or that the defendant <u>should</u> have known." <u>See</u> <u>Farmer</u>, 511 U.S. at 842, 843 & n.8, 114 S. Ct. at 1981, 1982 & n.8 (emphases added and internal quotation marks omitted).

<u>Hale v. Tallapoosa County</u>, 50 F.3d 1579 (11th Cir. 1995), dealt with an inmate's civil rights action against the county, sheriff, and jailer after he was beaten by other inmates while being held in a group cell. <u>Id.</u> at 1580. The plaintiff sought damages due to the defendants' alleged deliberate indifference to the substantial risk of serious harm that he faced while in their custody. <u>Id.</u> With respect to the sheriff, the plaintiff offered affidavits, depositions, and other evidence to support a finding that the sheriff "subjectively knew that a substantial risk of serious harm existed at the jail." <u>Id.</u> at 1583. Specifically, among other things, the plaintiff pointed to the sheriff's deposition where he testified that "he <u>knew</u> that inmate-on-inmate violence was occurring on a regular basis during [the time period of the attack] and other periods of overcrowding" and also that "he <u>knew</u> the violence sometimes resulted in injuries requiring medical treatment." <u>Id.</u> (emphases added). We further noted that the plaintiff was not required to show

53

that the sheriff "knew precisely who would attack whom, but only that [he] had subjective knowledge of a generalized, substantial risk of serious harm from inmate violence." Id. (internal citation and quotation marks omitted). Based on these allegations, we found that the evidence would sufficiently allow a reasonable jury to conclude that the plaintiff had satisfied the notice standard. Id. at 1585.

3.

Informed by the deliberate indifference case law, I reach several conclusions. First, allegations that the official actually knew that the plaintiff was being abused satisfy the subjective knowledge standard. Second, allegations that the official missed or misread warning signs that the plaintiff was in danger, or allegations that the officials failed to follow established departmental guidelines or procedures are tantamount to allegations of negligence, and are insufficient to establish subjective knowledge of a strong likelihood of serious harm. And third, allegations that an official was aware of the risk to others created by an individual's generally violent or troubled history are likewise insufficient. As we noted in Purcell v. Toombs County, 400 F.3d 1313, 1323 (11th Cir. 2005), "[i]n the jail setting, a risk of harm to some degree always exists by the nature of its being a jail." Cf. Farmer, 511 U.S. at 845, 114 S. Ct. at 1983 (noting due regard

54

for the fact that prison officials are appointed the "unenviable task of keeping dangerous men in safe custody under humane conditions" (internal quotation marks omitted)). That is why we held in Carter v. Galloway that even in the insular context of the prison community, "before [defendant-officials'] awareness arises to a sufficient level of culpability, there must be much more than mere awareness of [the aggressor's] generally problematic nature," proclivity to violence, or "propensity for being a problematic inmate." 352 F.3d at 1349–50 (emphasis added). The same holds true in the foster care context. The children who have been removed from their homes, detained, adjudicated dependents, and then placed into foster care are, almost by definition, "at risk" or "troubled."[66] Officials must have specific notice of something "much more" than that they are working with inherently "at risk" children before they are considered to be subjectively aware of a substantial risk of serious harm.

Indeed, a rule that specific knowledge of a child's prior history of sexual aggression is alone sufficient to constitute actual notice that the child poses a substantial risk of serious harm would be particularly ill-advised in the foster care context. It would effectively substitute our own judgment for the professional

[66] See supra note 2. According to plaintiffs' complaint, "approximately 80% of the children coming into foster care had significant emotional and/or behavioral problems with 27% having a history of sexual abuse." Compl. ¶ 56.

55

judgment of DCF officials. For example, when approving an overcapacity waiver, the Licensing Manual requires five specific officials to consider a multitude of factors, including the suitability of the home for the particular needs of the child, the effect on the quality of care, and the needs of the other children already in the home.[67] Such a rule would unduly constrict the latitude an official would otherwise have to determine that, upon consideration of the factors and the specific history of the child, a therapeutic setting such as the Calhoun home – where there had been no reported incidents of child-on-child sexual abuse for the six years before the November 23, 1998 report – is an appropriate placement that would not pose a substantial risk of serious harm.[68]

---

[67] See supra text accompanying note 35.

[68] Risk is not a fixed quantity; context modulates the magnitude of the risk. See Gish v. Thomas, 516 F.3d 952, 954–55 (11th Cir. 2008) ("To be deliberately indifferent to a strong likelihood that the prisoner will commit suicide, the official must be subjectively aware that the combination of the prisoner's suicidal tendencies and the feasibility of suicide in the context of the prisoner's surroundings creates a strong likelihood that the prisoner will commit suicide."). Trained professionals such as DCF officials are better equipped to navigate the complex inquiry of which home, with which foster parents, and with which other foster children will best mediate the risk posed by a particular child with a so-called "history of sexual perpetration." As the complaint itself evidences, the classification of a particular child as a "sexual abuse perpetrator" as opposed to a "sexual abuse victim" is not always clear-cut. One could also believe that a child who has committed an isolated incident of sexual assault might not always be regarded by a trained professional as a sexual abuse perpetrator or a child posing a substantial risk of sexual abuse to any other child he or she might encounter. Group dynamics, the experience and training of foster parents, the age and characteristics of the sexual abuse perpetrators, and the age and characteristics of the other children in the home are also significant considerations; certainly a child might pose a risk to one child in a given context and yet not another.

The deliberate indifference standard is compatible with a degree of deference to such good-faith professional determinations. Because the deliberate indifference analysis involves a subjective test, it does not matter if other judges, social workers, therapists, etc. believe that the plaintiffs faced a substantial risk of serious harm if the defendants themselves do not share that belief – that is, they "must also draw the inference." Farmer, 511 U.S. at 837, 114 S. Ct. at 1979; cf. id. at 844, 114 S. Ct. at 1983 ("Prison officials charged with deliberate indifference might show . . . that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent."). Receiving an isolated warning is not the same as believing the contents of that warning. For example, the weatherman may advise us that there is a high probability of precipitation, but we may look outside, make our own observations, and draw our own conclusions that the weatherman – though an "expert" – is wrong; we believe that rain is very unlikely. While we may or may not be negligent, we would certainly not be deliberately indifferent to the risk that it will rain. The same principle applies a fortiori in this context: we are dealing not with lay persons receiving advice from experts, but with trained experts in child welfare, DCF officials, receiving and evaluating advice from persons of varying degrees of

experience.

In addition to these observations, it is important to bear in mind the potential sources of notice in our case. In other words, an official's subjective belief about the safety of the children in the Calhoun home would have been formed on the basis of numerous sources of information: Mr. Calhoun and Joann Calhoun; G. Brock, the Calhouns' son; GALs; family members (or those entitled to visit the foster child); people in the community (e.g., teachers, doctors, dentists, therapists, coaches, friends from school, parents of friends); the circuit judges presiding over dependency proceedings; other Department employees, especially the caseworkers assigned to the foster children; and the foster children themselves.

V.

Although the complaint alleges that M.M. and D.L. began to engage in sexual activities with other children soon after their placement, there is no allegation that any of the defendants, the Department, or even the Calhouns ever had actual knowledge that these acts were occurring at any time before November 23, 1998, the day that sexual abuse of A.P. was reported to the hotline. Therefore, the question is whether the complaint sufficiently alleges that each defendant knew that plaintiffs faced a strong likelihood of such abuse in the home prior to

58

November 23.  I conclude that it does not.

## A.

Before embarking on a defendant-by-defendant review of the allegations, I pause to survey plaintiffs' 265-page complaint against the backdrop of the legal landscape.  I discern several key features common to all of the defendants.  First, there is no allegation that any of the defendants turned renegade and acted unilaterally in licensing the Calhoun home or approving any of the overcapacity waivers.  The officials worked together – not in ad hoc teams, but in designated teams composed of five specific members of the Department so as to ensure that the outcome would be the product of a collective decision-making process according to Department protocol, with inherent checks and balances.  Nor is there any allegation that the defendants who were involved in the waiver process failed to consider the requisite criteria set forth in the Licensing Manual.  In the absence of a specific allegation to the contrary, therefore, I presume that the defendant-officials acted in accordance with the law and that each overcapacity waiver was approved after each official had mentally performed the multifactor analysis described above.[69]  Cf. Cont'l Bank & Trust Co. v. Brandon, 297 F.2d 928, 932

---

[69] See supra text accompanying notes 35–37.

(5th Cir. 1962) ("[I]t is a presumption of law that a public officer will faithfully perform his duty."); Tecom, Inc. v. United States, 66 Fed. Cl. 736, 762 (Fed. Cl. 2005) (noting that although the presumption of regularity does not entail clear and convincing evidence to the contrary, "the burden of proving the non-occurrence of predicate acts required (by law or regulation) of public officials (such as the considering of certain facts, the review of applications, the receipt of authorizations, etc.) falls on the party asserting their absence").

Additionally, plaintiffs do not allege that any of the caseworkers communicated falsehoods, failed to report important information, or otherwise concealed information from their supervisors or other units. This fact is particularly significant, as there is no allegation that D.L. was not visited regularly in the Calhoun home by either Desmangles or by Wilburn – indeed, Wilburn also made contemporaneous visits to R.M. and N.M., and there is no allegation that Wilburn was aware of any child-on-child sexual abuse in the Calhoun home. Nor is there any allegation that Pollack failed to visit M.M. regularly from the time of his placement in March through August 1997. While plaintiffs allege that Pollack only visited D.L. once from February 27 to May 5, 1998, and only visited M.M. once from May 5 to September 1998, there is no allegation that her report of

information gathered from those visits was deficient in any way. Every official involved in the licensing or waiver approval process was therefore privy to what the caseworkers knew and reported about the Calhoun home and the foster children living there.

Finally, in reviewing the complaint, I remain cognizant of the factual implications of plaintiffs' allegations – that is, what plaintiffs do not allege is almost as important as what they do allege. By the time the Home by Home Review report was issued on September 8, 1998, M.M. and D.L. had been living in the Calhoun home for approximately 19 and 17 months, respectively. Presumably, the last reported incidents of sexual assault involving M.M. and D.L. were even more distant – occurring some time before January 1997 and April 1997, respectively. Consistent with the Calhoun home's track record, no one had ever reported that sexual abuse was occurring in the home – not any of the Calhouns; not any of the caseworkers assigned to the children; not any of the children's GALs; not any doctors or therapists or other community members such as teachers, friends, or coaches; not any of the circuit judges handling dependency proceedings; and not any of the children themselves. Significantly, N.M. was one of the foster children who was interviewed in the Home by Home Review; he gave no

61

indication that he was being sexually abused in any fashion, only that everyone was "mean to him." Nothing in the review of the Calhoun home – none of the interviews of the children that were conducted, none of the records that were inspected – indicated that anything sexually untoward was occurring in the home. This same configuration of facts was in place for all of the defendants until the report of A.P.'s abuse was made to the hotline on November 23, 1998.

What this survey reveals is that plaintiffs' allegations boil down to accusations of negligent wrongdoing on the part of the defendants: that the defendants failed to perform the requisite visits to foster children; that they failed to process overcapacity waivers on time; that they failed to investigate the home further; that they failed to take adequate measures to reduce overcrowding and improve supervision; or that reasonable officials would have reviewed the available information and come to a different conclusion about the strength of the risk of sexual abuse in the Calhoun home. A number of plaintiffs' allegations appear to disregard the reality of collective decision-making within the organizational hierarchy of the Department – the reality of officials assigned to specific units and making joint decisions according to specific protocol – and fault

the defendants for failing to act unilaterally.[70]  Nevertheless, because even gross negligence does not satisfy the standard of deliberate indifference, such allegations are insufficient as a matter of law to support claims for damages against the defendants.

B.

I begin with the claims against the two defendants who occupied supervisory positions, Edward Feaver, Secretary of the Department, and Johnny Brown, District Administrator of District 10, and recite the presumed facts and reasonable inferences therefrom on which those claims are based.  I then proceed to the remaining defendants who occupied positions at varying levels in the Department.

1.

---

[70]  For example, plaintiffs make conclusory allegations that defendants at all levels in the Department's chain of command had "the ability, authority and the means" to remove or to direct the removal of children from the Calhoun home: Feaver (Secretary of the Department), Brown (District Administrator), Kaufman (as Acting Child Welfare Director), Chang (as POA of Licensing and Placement), Kanaskie (as POA of Protective Investigations), Woodroof (as POA of "re-licensing and foster care"), Worsley (both as a Protective Investigator and as a Foster Care Supervisor), Andrews (as a Licensing Supervisor), Desmangles (Family Services Counselor), Pollack (Family Services Counselor), and Wilburn (Family Services Counselor).  The complaint implicitly alleges, therefore, that each of the defendants had the ability to act out of the Department's chain of command.  Or put another way, the complaint alleges that there was no effective chain of command when it came to the removal of children from foster homes, as anyone – from the Secretary of the Department to the caseworker in the home – had "the ability, authority and the means" to do so independently.  Even assuming each of the defendants had such authority, however, plaintiffs' allegations fall short of demonstrating deliberate indifference.

As Secretary of the Department, Feaver supervised all fifteen service districts. He was privy to numerous internal studies and reviews, media reports, and warnings from advocacy groups and the circuit judges who presided over dependency proceedings, stating that District 10's foster homes were seriously overcrowded and that children with histories of sexual abuse, both as victims and as perpetrators, were being placed in these overcrowded homes, increasing the risk of child-on-child sexual abuse. Among these reports was the September 8, 1998 report of the Home by Home Review.

Feaver first learned of the child-on-child sexual abuse at the Calhoun home on November 23, 1998, after someone called the Department's abuse prevention hotline to report that A.P. had been sexually abused by other children living in the home. A.P., N.M., and R.M. were removed from the Calhoun home within a day. An investigation of the Calhoun home followed immediately, resulting in the formulation and implementation of a plan to curtail further child-on-child sexual abuse at the home. The plan prescribed the steps that needed to be taken to eliminate the problem, and Feaver relied on the District 10 administrators to ensure that those steps were taken.

These facts fall short of establishing that Feaver was deliberately indifferent

to a substantial risk of child-on-child sexual abuse facing the children living in the Calhoun home. While Feaver certainly was aware of a heightened system-wide risk of child-on-child sexual abuse due to overcrowding and improper placement, there are no allegations that he possessed specific knowledge about a substantial risk of sexual abuse in the Calhoun home prior to A.P.'s report of abuse on November 23, 1998. Feaver's receipt of the Home by Home Review report establishes, at most, that the Calhoun home was overcrowded during this time – the report contained no allegations of child-on-child sexual abuse. The facts alleged in the complaint simply do not permit the inference that Feaver actually knew of a substantial risk to the plaintiffs and yet did nothing.[71] The district court therefore did not err in dismissing the plaintiffs' claims against him.

2.

Johnny Brown served as Administrator of District 10 from August 1997 to December 1998. In that capacity, he oversaw the operation of the District's foster home service. In July 1998, after having been informed by subordinates of child-

---

[71] The inference reasonably drawn from facts recited in the complaint is that the problems in District 10 resulted from the Department's system-wide institutional failures. As the court observed in Foltz, such institutional failures can serve to negate an inference that specific individuals supervising or employed in the system are deliberately indifferent – the failures being attributed to the system as a whole. Ray v. Foltz, 370 F.3d 1079, 1085 n.9 (11th Cir. 2004). It was the failure of the system as a whole that enabled the plaintiffs in Ward to obtain the injunctive relief the district court ordered.

65

on-child sexual abuse in the District's foster homes, Brown developed a "Draft District 10 Family Support and Preservation Child Welfare Improvement Plan." The plan proposed sweeping reforms, including "(1) a thorough case review for each child reported to have been abused or neglected, (2) a revised incident reporting system tracked by a Department Specialist with mandatory reporting to licensing, foster care, and circuit judges . . . and (6) a plan to significantly increase foster homes and decrease the number of children in each home." Omnibus Order at 16. The plan was implemented, but not adequately. Some incidents of child-on-child sexual abuse went unreported,[72] and the District's response to those that were reported was frequently inadequate. Brown did not cause the under-reporting, however; nor did he have knowledge of any failures by his subordinates adequately to respond to the incidents of abuse that were reported.

On September 8, 1998, Brown, like Feaver, received the findings of the Home by Home Review which included descriptions of overcrowding in the Calhoun home and the sexual perpetration histories of D.L. and M.M., but did not contain any allegations of child-on-child sexual abuse in the Calhoun home. And he, like Feaver, first learned of child-on-child sexual abuse in the Calhoun home on

---

[72]  I infer from this fact that, whether through negligence or through deliberate disregard, some incidents of child-on-child sexual abuse went either unperceived or unreported by foster parents, caseworkers, GALs, circuit judges, community members, etc.

November 23, 1998. As District 10 Administrator, Brown was ultimately responsible for the subsequent investigation and the plan that was devised to remedy the sexual abuse problem in the Calhoun home. However, he had no involvement in implementing the plan, for he left his employment with the Department in early December 1998. As the facts do not permit an inference that Brown was aware of and disregarded a substantial risk of child-on-child sexual abuse in the Calhoun home, the court committed no error in absolving Brown of liability by dismissing the plaintiffs' claims against him.

3.

Katherine Kaufman was POA of Protective Investigations and later served as the Acting Child Welfare Director in District 10.[73] Plaintiffs allege that Kaufman failed to direct the removal of M.M. and D.L. from the Calhoun home. Plaintiffs also allege that in October 1998, Kaufman was one of the Department officials who participated in the approval of overcapacity waivers that permitted two siblings, N.O. and J.O., to be placed in the Calhoun home, bringing to ten the total number of foster children living in the Calhoun home.

Plaintiffs indicate two sources of notice as demonstrative of subjective

---

[73] The complaint does not allege when Kaufman became Acting Child Welfare Director.

knowledge on Kaufman's part. First, in January 1997, M.M. had been removed from his natural mother's home and involuntarily committed to a psychiatric facility after having threatened his mother and sister. While he was still in the hospital, the Department received a report that M.M. had sexually assaulted his sister repeatedly. It was at this time that Kaufman – as POA of Protective Investigations – allegedly learned of M.M.'s case, as she sought unsuccessfully to place M.M. in a residential psychiatric facility.[74] Upon release from the hospital, M.M. was returned to his mother's home and was offered in-home therapeutic services.

Second, in September 1998, Kaufman – now the Acting Child Welfare Director – allegedly received a copy of the report of the Home by Home Review. In response, she established a Special Review Team to address any concerns highlighted in the report through the creation of Corrective Action Plans for each foster home.

Such facts as these cannot establish subjective knowledge of a substantial

---

[74] The district court read ¶¶ 165–66 of the complaint to allege that Kaufman received this report while M.M. "was living in the Calhoun home," and that she "did not remove M.M. from the Calhoun Home" at that time. Omnibus Order at 39. Upon perusal of the complaint, however, it is clear that the plaintiffs allege that M.M. was still in the psychiatric facility at the time Kaufman was informed of his behavior, and that he was returned to his natural mother's home upon release.

risk of sexual abuse to the children in the Calhoun home. Kaufman first learned of M.M.'s sexual history while he was residing in a psychiatric facility, not in the Calhoun home. As with Feaver and Brown, the report of the Home by Home Review informed Kaufman of a generalized risk of harm due to overcrowding in the Calhoun home, and indicated that D.L. and M.M. had a history of sexual and physical aggression – the kind of notice of a general propensity-to-harm that fails to establish subjective knowledge of a substantial risk of serious harm even in the prison context, because it is devoid of "specific facts" relating to a "particularized threat" to the plaintiffs and establishes, at best, a "generalized awareness of risk." See Carter v. Galloway, 352 F.3d 1346, 1349–50 (11th Cir. 2003 (noting that such information "does not provide a sufficient basis to make the inferential leap that a substantial risk of serious harm" existed"); see also Nichols v. Maynard, 204 Fed. Appx. 826, 828–29 (11th Cir. 2006) (unpublished). In other words, this kind of information might give rise to awareness of a possibility of sexual abuse in the Calhoun home, but it falls short of permitting the inference that Kaufman was actually aware of a strong likelihood of sexual abuse. These basic facts remained unchanged by the time Kaufman participated in the approval of the overcapacity waiver for siblings N.O. and J.O. a month later, in October 1998.

Kaufman's first actual notice of an incident of child-on-child sexual abuse came on November 23, 1998. On that day, she was the "On Call Administrator" fielding calls on the abuse prevention hotline, and she received the call regarding A.P. The caller described A.P.'s allegations – that he was being raped twice a day and that M.M. was the main perpetrator. Kaufman attended the hearing held in circuit court the next day and represented to the court that A.P.'s allegations were being investigated.

The district court dismissed the claims of A.P., N.M., and R.M. against Kaufman, noting that they were removed from the Calhoun home "just one day after Kaufman learned of A.P.'s sexual abuse allegations," and that "she could not have [had] subjective knowledge of sexual abuse allegations at the time they suffered their injuries." Omnibus Order at 42. I would affirm the dismissal.

4.

Corinne Millikan was a Family Services Specialist and Operations Management Consultant[75] in District 10 at some point during the time relevant to plaintiffs' allegations. As such, she had the authority to review and monitor the quality and safety of placements. Plaintiffs fault Millikan for her involvement in

---

[75] I remain largely in the dark as to the role of an Operations Management Consultant. The complaint provides no separate description of Millikan's responsibilities in this role. Compl. ¶ 18. Nor do plaintiffs allege when Millikan served in each position.

the approval of overcapacity waivers that permitted certain children to live in the Calhoun home, specifically A.P., R.M., and children with mental health problems. [76]

Like the other defendants in this case, Millikan was aware that many of the District's foster homes were overcrowded and that the presence of children with histories of sexual abuse, both as perpetrators and victims, created a generalized risk of child-on-child sexual abuse. Her duties, which did not bring her into day-to-day contact with the children in foster care, included participating in the approval of overcapacity waivers and creating Corrective Action Plans following the Home by Home Review.

Millikan was aware of overcrowding in the Calhoun home as early as January 31, 1995, when she attended a licensing meeting where the home's consistent overcrowding was discussed. In June 1996, she attended a District 10

---

[76] It is unclear from the complaint who else was involved in the approval of overcapacity waivers for A.P. and R.M. In the absence of specific allegations to the contrary, I presume that the other participants included a Licensing Supervisor, Placement Supervisor, POA of Licensing and Placement, and the Child Welfare Director, and that they followed the decision-making protocol set out in the Licensing Manual.

The complaint also alleges that on December 10, 1998, Millikan participated in the approval of a waiver placing another child, B.J., in the Calhoun home. It is clear from the complaint, however, that this particular B.J. is not the same B.J. who is earlier described in the complaint as having been identified as"a danger to himself and others"; that particular B.J. resided in the Calhoun home "until April, 1998 when he turned eighteen." Compl. ¶ 102. The allegation that Millikan approved the placement of another child with the same initials on December 10, 1998 – over two weeks after all of the plaintiffs had been removed from the Calhoun home – cannot support a finding of subjective knowledge and deliberate disregard of a substantial risk of serious harm to the plaintiffs prior to November 23, 1998.

meeting discussing a report of domestic violence in the Calhoun home, wherein Mr. Calhoun had chased Joann Calhoun while brandishing a steak knife. Nearly two years later, in September 1998, Millikan received the report of the Home by Home Review, which described the Calhoun home as "cramped" and noted that two children with histories of sexual perpetration, D.L. and M.M., had been placed in that home. At no time during this period was there ever any report of sexual abuse in the Calhoun home. As part of the Special Review Team, Millikan assisted in drafting specifically tailored Corrective Action Plans for each of the 50 homes surveyed by the Review. Shortly thereafter, Millikan was one of the officials who participated in the approval of belated overcapacity waivers permitting the placement of A.P. and R.M. in the Calhoun home.

Though Millikan might have interpreted the information she had to mean that the children in the Calhoun home faced a generalized risk of sexual assault, there are no allegations that, prior to the November 23, 1998 report of A.P.'s abuse, Millikan was aware of specific facts or a "particularized threat" of sexual abuse from which she could have inferred that the children faced a strong likelihood of sexual abuse. See Carter, 352 F.3d at 1350. Indeed, by the time the report of the Home by Home Review was issued, M.M. and D.L. had lived in the

often overcrowded Calhoun home for 19 and 17 months with no reports of sexual abuse; and by the time that Millikan participated in the waiver approvals, A.P. and R.M. had resided in the Calhoun home for nearly two weeks and five months, respectively, without any reported incident. As it turned out, the conclusion that A.P. and R.M. did not face a substantial risk of sexual abuse may have been wrong; but Monday morning quarterbacking alone is insufficient to support a damages claim against Millikan.

The report of A.P.'s abuse in November 1998 was the first specific notice Millikan received that a substantial risk of child-on-child sexual abuse existed in the Calhoun home. For this reason, the district court concluded that with respect to the claims of A.P., N.M., and R.M., the facts failed to establish a case of deliberate indifference. I find no error in the court's ruling.

5.

Sharon Woodroof was a District 10 Family Services Specialist who worked with the Licensing Unit and Placement Unit.[77] Plaintiffs also allege that at some

---

[77] As a Family Services Specialist, Woodroof had the authority to

> 1) assist district staff with program planning and development; 2) provide ongoing technical assistance in her area(s) of expertise; 3) monitor the provision of services to children in her area(s) of expertise; 4) perform quality assurance reviews; 5) ensure that policy guidance was available and understandable to direct services and support staff; 6) review and approve allowable exceptions to policy,

later point – I presume in the latter half of 1997 or 1998 – Woodroof became a POA supervising "re-licensing and foster care,"[78] in which capacity they allege she had the ability "to direct the removal of a child from any foster home placement in which there was a substantial risk of serious harm to the child." Compl. ¶ 16.

A.P., R.M., and N.M. allege that Woodroof acted in a deliberately indifferent manner through the following actions she undertook as a Family Services Specialist in collaboration with Licensing and Placement: (1) on May 19, 1995, participating in the increase of the Calhoun home's licensed capacity to five children; (2) in February 1997, participating in the approval of an overcapacity waiver that allowed certain children, including M.M., to be placed in the Calhoun home; (3) on February 21, 1997, participating in the approval of an overcapacity waiver allowing R.B. (described by plaintiffs as a "fire setter and sexual abuser") to be placed in the Calhoun home; (4) in April 1997, participating in the approval

---

including waivers of maximum licensed foster home capacity; 7) deny exceptions to policy and/or waivers of capacity which placed children at substantial risk of serious harm; and 8) ensure that children who posed a known substantial risk of harming other children were not placed in situations where they were in a position to harm other children.

Compl. ¶ 15.

[78] The allegation that Woodroof was a POA supervising both the Foster Care Unit and the Licensing Unit is contrary to my understanding of the organizational structure of DCF as described in the complaint. Nonetheless, I assume for purposes of the defendants' motions to dismiss that such was the case.

of an overcapacity waiver that allowed D.L. to be placed in the Calhoun home; and (5) on May 19, 1997, approving the re-licensing of the Calhoun home for seven foster children. Plaintiffs also allege that in Woodroof's capacity as a POA supervising "re-licensing and foster care," she failed to direct D.L.'s removal from the Calhoun home and place him in a residential facility.

As sources of notice, plaintiffs allege that: (1) on February 14, 1997 and April 8, 1997, when M.M. and D.L. were placed in the Calhoun home, Woodroof was aware of their behavioral histories and the histories of the children already living in the home; (2) on May 17, 1998, Woodroof received a letter from a GAL describing the overcrowded conditions in the Calhoun home, which Woodroof proceeded to forward to the Licensing Unit; (3) in September 1998, Woodroof received a copy of the report of the Home by Home Review; and (4) in October 1998, Woodroof received a letter from Joann Calhoun stating that D.L.'s case file reflected "sexual issues" and problems with "lying [and] being physically aggressive," and that she did not know who D.L.'s caseworker was.

Because plaintiffs point to specific actions spanning three years and specific sources of notice that Woodroof allegedly received over the course of those three years, it is necessary to parse each allegation with an eye toward what Woodroof

75

actually knew at each point in time. To begin with, the allegation that Woodroof's approval of a waiver for R.B. demonstrated deliberate indifference to the plaintiffs is groundless. It is perhaps unsurprising that there is no allegation that R.B. abused the plaintiffs, because a year had already elapsed between the time that R.B. left the Calhoun home (April 1997) and the time that the first of the plaintiffs had entered it (April 1998). Compl. ¶¶ 120, 228. R.B.'s presence in the Calhoun home could not even have contributed to overcrowding in any way that would have affected the plaintiffs.

As for the remaining four actions that plaintiffs allege Woodroof committed as a Family Services Specialist – actions taken in May 1995, February 1997, April 1997, and May 1997 – letters and other materials received by Woodroof at later dates could not have formed the basis of her subjective knowledge at the time she made those decisions. The only relevant allegation is that Woodroof was aware of the behavioral histories of M.M., D.L., and the other children in the Calhoun home.[79] These facts do not permit the inference that Woodroof actually knew of and deliberately disregarded a substantial risk of serious harm to the plaintiffs. The general risk posed by M.M., D.L., and the thousands of other "at risk" children

_____

[79] Of course, Woodroof could not have been aware of the behavioral histories of M.M. and D.L. as of the May 19, 1995 licensing of the Calhoun home for five children, since they did not enter the home until February 14 and April 8, 1997.

served by the Department is not enough to make out a case of deliberate indifference to a particular child's safety.  Nowhere is it alleged that Woodroof believed – actually drew the inference from the surrounding circumstances – that M.M. or D.L. posed a substantial threat to the children in the Calhoun home either before their initial placement or prior to the home's re-licensing.  In fact, the complaint suggests otherwise: Woodroof, along with a Placement Supervisor, a Licensing Supervisor, the POA of Licensing and Placement, and the Child Welfare Director, considered the available placements for M.M. and D.L. and decided that the Calhoun home, known for its ability to handle troubled boys successfully, was the most appropriate setting for these children.[80]  Thereafter, based on her knowledge of the children in the Calhoun home and the fact that they had peaceably existed as a group for over a month, Woodroof concurred in the recommendation from the Licensing Unit that the home be re-licensed.

Plaintiffs also allege that in her later capacity as POA of "re-licensing and foster care," Woodroof should have removed or directed the removal of D.L. from the Calhoun home and ordered his placement in a residential treatment facility.  As before, allegations that Woodroof was aware of a general background risk do not

---

[80]  I note once more that at the time of M.M. and D.L.'s respective placements, at least three other children in the Calhoun home were older than M.M. and D.L., who were both twelve years old: 17-year-old R.D., 17-year-old B.J., and 13-year-old R.T.

reasonably support the inference that Woodroof actually knew of a strong likelihood of sexual abuse in the Calhoun home. Although Joann Calhoun's letter specifically related her concern for D.L., the letter does no more than point to D.L.'s history as described in his case file, which was already known to Woodroof and the other Department officials who had collectively decided that the Calhoun home was an appropriate placement for D.L. Joann Calhoun's letter does not contain a warning that D.L. created such a risk to the other children that he ought to be removed from the home; rather, Joann Calhoun expresses frustration with the Department and requests that D.L. be provided with another caseworker, whose services she regarded as "imperative to being able to maintain D.[L]." Compl. ¶ 206. The letter is insufficient to establish that Woodroof thereafter believed that, contrary to the conclusion she and other Department officials had earlier drawn, D.L.'s placement in the Calhoun home created a strong likelihood of sexual abuse to the other children.

Woodroof had no knowledge of a substantial risk of child-on-child sexual abuse in the Calhoun home until after the Department received the November 23 call to the abuse prevention hotline about A.P. I therefore find no error in the dismissal of the claims against her.

6.

At the time relevant to plaintiffs' allegations, Susan Kanaskie was a Protective Investigations Supervisor for District 10. Plaintiffs contend that Kanaskie approved the placement of M.M. in the Calhoun home despite being aware of the substantial risk of serious harm that decision would create. This claim is unsupported by specific allegations regarding Kanaskie's subjective knowledge.[81]

Kanaskie did not learn of the child-on-child sexual abuse at the Calhoun home until December 11, 1998, when Susan Worsley, then a Foster Care Supervisor, and Elaine Corsino, the Acting Protective Investigations Supervisor, informed her about the November 23 telephone call to the abuse prevention hotline regarding A.P. Because Kanaskie was unaware, prior to December 11, of the risk to the children in the Calhoun home, the district court properly held that she was

---

[81] Additionally, my understanding of District 10 operating procedures (based upon plaintiffs' own allegations, Compl. ¶ 41) does not permit the inference that Kanaskie was even actively involved in the decision to place or maintain M.M. in the Calhoun home in February 1997. As the supervisor of Susan Worsley, M.M.'s Protective Investigator, Kanaskie would have reviewed M.M.'s background, risk assessments, and placement history and then would have assisted in providing this information to the Placement Unit. Since the Calhoun home was operating at capacity, the decision to place M.M. in the home was thereafter made by the Placement Unit in coordination with the Department officials involved in authorizing overcapacity waivers – the Placement Supervisor, Licensing Supervisor, POA of Licensing and Placement, a Family Services Specialist, and the Child Welfare Director. Once M.M. was placed in the Calhoun home and declared a dependent, his case would have been transferred from the Protective Investigations Unit to the Foster Care Unit – ending Kanaskie's involvement.

79

not deliberately indifferent to the plaintiffs' constitutional right to a safe environment.

7.

Susan Worsley served as a Protective Investigator and subsequently as a Foster Care Supervisor in District 10.[82] She was initially assigned to M.M.'s case on February 3, 1997, while he resided at the Lippman Shelter. As his Protective Investigator, Worsley was informed of M.M.'s history of sexual abuse and his psychological and behavioral problems. As a Foster Care Supervisor, Worsley oversaw M.M.'s caseworker. Plaintiffs allege that Worsley was deliberately indifferent to their safety by placing M.M. in the Calhoun home, failing to create a plan of care to ensure the safety of the other children in the Calhoun home, and failing to visit M.M.

On February 12, 1997, Worsley was advised that M.M. could no longer remain at the Lippman Shelter because of his history and his need for 24-hour one-on-one supervision. Worsley then contacted the Department's Placement Unit to inquire about a new placement for M.M. Worsley suggested the Calhoun home (I infer that her recommendation was due to the Calhoun home's reputation for

---

[82] The complaint does not allege precisely when Worsley became a Foster Care Supervisor; however, it alleges that she was a Protective Investigator at least through March 1997 and suggests that she was a Foster Care Supervisor as of November 23, 1998.

80

managing troubled and unruly boys similar to M.M.) but was advised by an unspecified employee in the Placement Unit that M.M. was "too dangerous" to be placed there. Despite this initial recommendation, the Placement Supervisor considered an overcapacity waiver that would allow M.M. to be placed with the Calhouns. After examining M.M.'s background, the children already in the Calhoun home, and the availability of other suitable placements, various officials in the Department concurred in the approval of an overcapacity waiver: the Placement Supervisor, Licensing Supervisor, Family Services Specialist, POA of Licensing and Placement, and the Child Welfare Director.

M.M. was placed in the Calhoun home on February 14, 1997, and Worsley continued to serve as his Protective Investigator until his case was transferred to the Foster Care Unit on March 27, 1997, following his adjudication as a dependent. During this time period, Worsley visited the Calhoun home on one occasion – February 19, 1997 – and was informed by Joann Calhoun's son that M.M. had a "violent explosion" the previous day. Worsley failed to perform any further home visits, though allegedly she was required to visit weekly from February 14 to March 27, 1997. [83]

---

[83] N.M., R.M., and A.P. were not placed in the Calhoun home until over a year later– April 24, 1998, May 6, 1998, and September 17, 1998, respectively.

On December 9, Worsley learned about the November 23, 1998 call to the Department's abuse prevention hotline alleging that A.P. had suffered sexual abuse in the Calhoun home. The facts establish that this was the first notice to Worsley of a substantial risk of child-on-child sexual abuse in the Calhoun home. Prior to this time, Worsley was only aware of M.M.'s troubled background and that he had one violent outburst during his placement in the Calhoun home. One cannot reasonably infer from these facts that Worsley believed that the children in the Calhoun home faced a substantial risk of child-on-child sexual abuse. While her failure to perform the necessary visitation is deplorable, it does not constitute deliberately indifferent behavior. I therefore find no error in the court's decision to dismiss the plaintiffs' claims against Worsley.

8.

Jennifer Chang was initially POA of Licensing and Placement and later became a Family Services Specialist in March 1998. The main allegation against Chang stems from her involvement as POA in approving overcapacity waivers that allowed children with sexual perpetration histories and mental health problems to be placed in the Calhoun home, including M.M. and D.L.[84] In February 1997 and

---

[84] Although plaintiffs allege that Chang also improperly approved overcapacity waivers permitting B.J. (described by plaintiffs as "a danger to himself and others") and R.B. (described by plaintiffs as a "fire setter and sexual abuser") to live in the Calhoun home, these allegations

April 1997, when M.M. and D.L. were placed in the Calhoun home, Chang was aware of their behavioral histories and of the general overcrowding of foster homes in District 10. With respect to M.M., Chang had also attended a court hearing in M.M.'s dependency case in which the circuit judge "expressed fear that M.M. would hurt someone at the Calhoun home due to his history of physical and sexual aggression." Compl. ¶ 116. Chang was one of the persons who subsequently participated in the approval of overcapacity waivers with respect to M.M. and D.L.; in accordance with Department policy, the other officials involved in the waiver approval process included a Placement Supervisor, a Licensing Supervisor, a Family Services Specialist, and the Child Welfare Director.

These facts do not make out a claim of deliberate indifference with respect to Chang. As with Woodroof, the complaint does not indicate that Chang believed M.M. or D.L. to pose a substantial threat of sexual abuse to the children in the Calhoun home. The most reasonable inference from these facts is that Chang evaluated the case files of the children, and in M.M.'s case, the judge's "fear that M.M. would hurt someone at the Calhoun home due to his history of physical and

---

are irrelevant to the plaintiffs' claims as there is no allegation that B.J. or R.B. abused the plaintiffs – logically enough, as B.J. left the Calhoun home when he turned 18 in April 1998 (Compl. ¶ 102), and R.B. left the Calhoun home a year earlier, in April 1997 (Compl. ¶ 120). They could not have even contributed to overcrowding in the Calhoun home in any way that would have affected the plaintiffs.

sexual aggression."  (Recall that M.M. had sexually abused his sister and had threatened his family members with a knife.)  Then, based on her professional judgment and experience in the foster care system, she and her colleagues concluded that M.M. and D.L. would not in fact pose a substantial risk of serious harm to the other children then living in the Calhoun home – a home with "the reputation of taking in troubled and/or difficult to control young males," Compl. ¶ 90 – and approved the overcapacity waivers.[85]

Additionally, the plaintiffs allege deliberate indifference in regard to Chang's actions as a Family Services Specialist following the Department's issuance of the report of the Home by Home Review on September 8, 1998. Chang was a member of the Special Review Team that drafted a Corrective Action Plan for each of the 50 homes examined during the Review.  While the complaint does not allege what the Corrective Action Plan for the Calhoun home contained, it does allege that the plan failed to address D.L.'s and M.M.'s histories of sexual perpetration and failed to reduce the Calhoun home's capacity.  The plaintiffs

---

[85] One must remember that neither the size nor the composition of the Calhoun home remained the same from the times that M.M. and D.L. were placed there on February 14, 1997 and April 8, 1997, and the times that N.M., R.M., and A.P. entered the home on April 24, 1998, May 6, 1998, and September 15, 1998.  M.M. and D.L. brought the population of the home to six and seven children, respectively, and were among the younger children in the home.  Chang, of course, had no knowledge of the individual characteristics of N.M., R.M., and A.P. at the time she participated in the waiver process for M.M. and D.L.

84

would have Chang held liable for the sexual abuse A.P., N.M., and R.M. may have sustained at the hands of D.L. and M.M. based on the inadequacy of the Special Review Team's Corrective Action Plan. Because, at best, such liability sounds in negligence, not deliberate indifference to the infringement of a constitutional right, the district court committed no error in dismissing the plaintiffs' claims against Chang.

9.

As a Licensing Counselor and later as a Licensing Supervisor,[86] Margaret Andrews was responsible for the annual licensing review of several foster homes in District 10 and participated in the overcapacity waiver process. The plaintiffs would hold Andrews liable for the following alleged actions: (1) in July 1996, recommending re-licensing the Calhoun home despite the fact that an investigation into neglect and domestic violence allegations had not been finalized, in contravention of Department policy; (2) in July 1996, failing to properly investigate another allegation of physical abuse and domestic violence in the Calhoun home, in contravention of state law and Department policy; (3) in February 1997, participating with a Placement Supervisor, Woodroof (Family

_____

[86] The complaint does not allege when Andrews became a Licensing Supervisor.

Services Specialist), Chang (POA of Licensing and Placement), and the Child Welfare Director in the approval of the overcapacity waiver that allowed M.M.'s placement in the Calhoun home; and (4) on May 16, 1997, recommending to her supervisor, Woodroof, that the Calhoun home be re-licensed for a capacity of seven foster children.

The complaint does not permit the inference that Andrews at any time was subjectively aware that the plaintiffs faced a substantial risk of child-on-child sexual abuse in the Calhoun home. First, even if her conduct in 1996 were causally related to the injuries the plaintiffs suffered – which is uncertain because neither the alleged abusers nor the plaintiffs came to the home until 1997 and 1998, respectively – violating state procedural laws or departmental procedures does not constitute deliberate indifference. See Ray v. Foltz, 370 F.3d 1079, 1085 (11th Cir. 2004) ("Allegations of failure to follow state policies and procedures . . . do not support a claim for damages, such as the [plaintiffs']. Where damages are sought, more must be shown that negligent failure to follow Department guidelines and procedures."). As to her actions in 1997, all I can glean from the complaint is that Andrews knew that seven foster children were residing in the Calhoun home with mental health issues, including several children with sexual abuse and

perpetration histories – a profile that fit the majority of homes in District 10. It cannot be inferred from these facts that Andrews actually drew the inference that the children in the Calhoun home faced a substantial risk of harm, especially in light of the fact that child-on-child sexual abuse was never known to have occurred during the six years that the Calhouns housed troubled children. The court properly found that the allegations against Andrews failed to state a claim for relief.

10.

The district court dismissed the claims against Loubert Desmangles, Susan Wilburn, and Sharon Pollack, District 10 caseworkers who held the title "Family Services Counselor." The court did so because the facts failed to show that these caseworkers were deliberately indifferent to the plaintiffs' constitutional right to a safe foster home environment. I agree. Plaintiffs' allegations establish, at best, that the defendants were aware of circumstances that may have permitted the inference that a substantial risk of sexual assault existed in the Calhoun home. But none of the allegations, viewed in terms of what each defendant individually knew, permit the inference that the defendant actually drew such an inference.

Loubert Desmangles was present when D.L. admitted in April 1997 that he

had sexually assaulted three or four boys who lived near his old foster home. After an overcapacity waiver permitting D.L.'s placement in the Calhoun home was requested and approved by the necessary Department officials, Desmangles placed D.L. in the Calhoun home. At some point after D.L.'s placement, the Sexual Assault Treatment Center informed Desmangles that it had terminated D.L.'s sexual abuse therapy "due to the most recent child-on-child incident involving D.L.," and that D.L. would require intensive therapeutic services in a residential facility for sexual offenders. Compl. ¶ 192. In June 1997, Joann Calhoun informed Desmangles that D.L. was having "behavioral problems," Compl. ¶ 194 – of what nature we do not know. Finally, plaintiffs allege that on July 1, 1997, Desmangles "was ordered" – the complaint does not say by whom – "to place D.L. in a residential treatment facility specializing in sexual offender treatment," Compl. ¶ 195, but did not do so.

In sum, plaintiffs allege that Desmangles knew that D.L. had a history of sexual perpetration, that at least two other persons believed that D.L. should be placed in a residential treatment facility, and that he had unspecified "behavioral problems." But he also knew that at least five Department officials had considered D.L.'s file and had approved an overcapacity waiver to place D.L. in the Calhoun

home (known for its ability to handle troubled children) with six other boys – at least five of whom were at least as old or older than D.L. Desmangles also had his own first-hand observations. As alleged in the complaint, Desmangles was required to visit D.L. in the home at least monthly; the purpose of these visits was to assess the safety of the placement and to report any concerns about the condition of the foster home to the Licensing Unit or any suspected abuse or neglect to the District's abuse prevention hotline. There is no allegation that Desmangles failed to make regular visits to D.L. in the Calhoun home, with concurrent information-gathering that yielded nothing more. While plaintiffs' allegations might satisfy an objective standard of negligence, therefore, they are insufficient to establish that Desmangles himself believed that D.L.'s presence in the Calhoun home created a strong likelihood of sexual abuse to the other children.

Susan Wilburn was assigned to D.L. on May 12, 1998. At that time, she was informed by D.L.'s GAL that he "was inappropriately placed in the Calhoun foster home and needed intensive, in-patient treatment at a facility for sexual offenders." Compl. ¶ 203. Later that month, Joann Calhoun informed Wilburn that D.L. was in "desperate need of help" and had physically assaulted one of the other children. Compl. ¶ 204. The details of the assault are nowhere alleged; nor is the identity of

the child who was assaulted. On May 21, 1998, Wilburn was assigned to N.M. and R.M. She continued to serve as counselor to D.L., N.M., and R.M. for a little under four months, until she left the Department on September 11, 1998. There is no allegation that Wilburn failed to make regular visits to all three of these children in the Calhoun home. Nor is there any allegation that Wilburn learned of child-on-child sexual abuse in the Calhoun home during her visits to these three children. Rather, plaintiffs allege that Wilburn failed to take adequate steps to ensure that D.L. did not abuse the other children in the Calhoun home, or to protect N.M. and R.M.

Like Desmangles, Wilburn knew that D.L. had a history of sexual perpetration and that at least one person believed he should be placed in a residential treatment facility. She also knew, however, that there had been no reports of D.L. acting out sexually in the Calhoun home in the thirteen months he had lived there. And perhaps most significantly, Wilburn had her own first-hand observations from visiting three children – D.L., N.M., and R.M. – in the Calhoun home, with the concomitant opportunity to monitor their specific interactions. Plaintiffs' additional allegation that Wilburn knew of one occasion where D.L. had physically assaulted one of the children in some fashion is insufficient to establish

90

that Wilburn believed that D.L. created a strong likelihood of sexual abuse to the children in the Calhoun home.

Sharon Pollack was assigned to M.M. upon his placement in the Calhoun home in March 1997, and continued until August 1997. There is no allegation that she failed to visit M.M. regularly during this time. A little over ten months after D.L.'s placement in the Calhoun home, on February 27, 1998, Pollack was temporarily assigned to be D.L.'s counselor. She visited him once on March 5, 1998; her assignment ended on May 5, 1998, when she was re-assigned to M.M. and continued in that capacity until September 1998. During that time, plaintiffs allege that Pollack visited M.M. only once, on June 25, 1998.

The sum total of plaintiffs' allegations regarding Pollack's state of knowledge is that she was aware of M.M. and D.L.'s sexual perpetration histories and knew that they were living in a crowded home with troubled children. Plaintiffs' case against Pollack is a classic example of plain vanilla negligence – that she should have recognized the risk of sexual abuse to the other children; that she should have made regular visits to M.M. and D.L.; and that she should have removed M.M. and D.L. or developed a plan to ensure that the children did not become the perpetrators or victims of sexual abuse. While these facts were

91

probative of the class action claim for injunctive relief in <u>Ward</u>, they do not establish the deliberate indifference to a constitutional right necessary to recover money damages against the caseworkers individually.

VI.

The complaint in this case alleges many facts from which the defendants could, or perhaps should, have inferred that a substantial risk of serious harm existed in the Calhoun home; however, there are no specific allegations that they actually drew such an inference and then chose to disregard it.[87]  I would hold that the district court did not err in dismissing the claims before us.

APPENDIX

Florida Department of Children and Family Services

---

[87]  Determining which of the facts alleged in the complaint's 265 pages is relevant to the question of whether a particular defendant engaged in deliberately indifferent conduct is not an insubstantial task.  The difficulty of this case was further compounded by the "shotgun" style of pleading that we have vehemently criticized time and time again.  <u>See, e.g.</u>, <u>Davis v. Coca-Cola Bottling Co. Consol.</u>, 516 F.3d 955, 979–80 (11th Cir. 2008); <u>United States v. McInteer</u>, 470 F.3d 1350, 1354 n.6 (11th Cir. 2006); <u>M.T.V. v. DeKalb County Sch. Dist.</u>, 446 F.3d 1153, 1156 n. 1 (11th Cir. 2006); <u>Ambrosia Coal and Constr. Co. v. Morales</u>, 368 F.3d 1320, 1330 n.22 (11th Cir. 2004); <u>Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.</u>, 305 F.3d 1293, 1296 nn. 9-10 (11th Cir. 2002); <u>Byrne v. Nezhat</u>, 261 F.3d 1075, 1128–34 (11th Cir. 2001) <u>Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.</u>, 77 F.3d 364, 367 (11th Cir.1996); <u>Pelletier v. Zweifel</u>, 921 F.2d 1465, 1518 (11th Cir.1991).  Simply put, justice requires lawyers not to do it and trial judges not to allow it.

| Secretary | | | |
|---|---|---|---|
| Edward Feaver | | | |

| District Administrator of District 10 [1] | | | |
|---|---|---|---|
| Johnny Brown (8/97-12/98) | | | |

| Child Welfare Director [2] | | | |
|---|---|---|---|
| Katherine Kaufman (second) | | | |

| Program Operations Administrator of Protective Investigations Unit Susan Kanaskie (after 4/98) Katherine Kaufman (first) | Program Operations Administrator of Licensing Unit and Placement Unit Jennifer Chang (until 3/98) | | Program Operations Administrator of Foster Care Unit Sharon Woodroof (second) [3] |
|---|---|---|---|
| Protective Investigations Supervisors Susan Kanaskie (until 4/98) | Licensing Supervisors Margaret Andrews (second) | Placement Supervisors | Foster Care Supervisors Susan Worsley (as of 11/98) |
| Protective Investigators Susan Worsley (until 3/97) | Licensing Counselors Margaret Andrews (first) | Placement Counselors | Family Services Counselors Loubert Desmangles Susan Wilburn Sharon Pollack |

---

[1] Fifteen service districts provided services in the areas of economic self-sufficiency; developmental disability; alcohol, drug abuse, and mental health; and children and families.

[2] A Program Administrator and a number of Family Services Specialists assisted the Child Welfare Director via consultation and administrative support. During the time period relevant to the complaint, Jennifer Chang (after 3/98), Sharon Woodroof (first), and Corinne Millikan served as Family Services Specialists.

[3] Plaintiffs allege that Woodroof served as POA of "re-licensing and foster care."